Filed 6/26/26  P. v. Weinstein CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B327696 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA484270) |
| v. | |
| HARVEY WEINSTEIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Judgment of conviction affirmed; sentence vacated and remanded for resentencing.

The Freedman Firm, Michael G. Freedman; Bonjean Law Group and Jennifer Bonjean for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stacy S. Schwartz, David F. Glassman and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Harvey Weinstein appeals from a judgment entered after a jury found him guilty of forcible oral copulation, sexual penetration by a foreign object and forcible rape, and the court sentenced him to 16 years in prison. He raises numerous contentions on appeal, including claims of evidentiary, instructional, prosecutorial, and sentencing error. We reject his attempts to disturb the jury's guilty verdicts, but we agree, as does the Attorney General, that he is entitled to remand for resentencing because the court imposed an upper term sentence based on a now-invalid aggravating factor.

## BACKGROUND

### A. Brief Procedural Overview

A fourth amended grand jury indictment charged Weinstein with seven counts of sexual offenses against four women.

A jury trial commenced on October 24, 2022, and closing arguments concluded on December 2, 2022. Approximately 50 witnesses testified and nearly 300 exhibits were admitted into evidence. After deliberating for about nine days, the jury reached its verdicts on December 19, 2022.

The jury found Weinstein guilty on three counts involving Jane Doe No. 1 (JD1): forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)(A); count 1), sexual penetration by a foreign object (Pen. Code, § 289, subd. (a)(1)(A); count 2), and forcible rape (Pen. Code, § 261, subd. (a)(2); count 3).

The jury was unable to reach a verdict on count 4 involving Jane Doe No. 2, sexual battery by restraint (Pen. Code, § 243.4, subd. (a)), and the court declared a mistrial as to this count.

The jury found Weinstein not guilty on count 5 involving Jane Doe No. 3, sexual battery by restraint (Pen. Code, § 243.4,

subd. (a)).  The jury was unable to reach a verdict on a lesser included offense of count 5, sexual battery (Pen. Code, § 243.4, subd. (e)(1)), and the court declared a mistrial as to this count.

The jury was unable to reach a verdict on the counts involving Jane Doe No. 4, forcible oral copulation (Pen. Code, § 288a, subd. (c)(2); count 6) and forcible rape (Pen. Code, § 261, subd. (a)(2); count 7), and the court declared a mistrial as to these counts.

## B.    Evidence Presented at Trial

We include here a summary of evidence that is pertinent to the convictions involving JD1 and our resolution of Weinstein's contentions on appeal.

The events giving rise to the charges occurred in February 2013, when JD1 was in Los Angeles attending a film festival.  At the time, she lived in Rome, Italy with her husband and three children, and she worked as an actress and model.  She spoke little English; her first language was Russian, and she spoke Italian when she was in Italy.[1]

### 1.    *JD1 and Weinstein attend the 2013 Los Angeles Italia Film Festival*

Pascal Vicedomini,[2] an Italian journalist, cofounded multiple film festivals, including two held annually in Italy and

---

[1] At trial, in 2022, JD1 chose to testify in English, with a Russian language interpreter standing by to assist as needed.

[2] Vicedomini was not present at trial.  The jury was shown a video recording of conditional examination testimony he gave shortly before trial.  As discussed later in this opinion, the court allowed the conditional examination to proceed by videoconference based on a finding that Vicedomini had a medical condition that made it dangerous for him to fly to Los Angeles

3

one held annually in Los Angeles.  The latter, named the Los Angeles Italia Film Festival, was founded "[t]o create an industrial as well as cultural bridge between Italy and the United States."  Both JD1 and Weinstein attended the Los Angeles Italia Film Festival in February 2013.

Vicedomini had known JD1 since 2009, when he was introduced to her by an Italian producer with whom she was then working.  Vicedomini and JD1 became friends, and he also developed a relationship with her family over the years.  JD1 worked with Vicedomini on some of his film festivals.  In February 2013, she made arrangements to attend the Los Angeles Italia Film Festival and coordinated with Vicedomini.  She did not have an "official" role with this festival, but she was part of an Italian "team" attending.  Her unofficial role was to "walk the red carpet," have her photograph taken with various guests, and participate in interviews with journalists.

Vicedomini personally invited Weinstein to attend the film festival in February 2013.  Awards were going to be handed out to persons associated with two films produced by The Weinstein Company, and Vicedomini wanted Weinstein to present one of the awards.  In an email to Weinstein, Vicedomini jokingly referred to Weinstein as "the owner of the festival," given how central Weinstein's films were to the festival's events.

A year or two before the 2013 Los Angeles Italia Film Festival, JD1 met Weinstein in Rome, Italy.  Vicedomini invited her to join him for a drink outside a hotel.  When she arrived, he introduced her to multiple people, including Weinstein, a few

---

from his home in Rome, Italy for an in person examination. Weinstein challenges this ruling on appeal.

women, and another man. JD1 did not converse with any of them because she did not speak English then, although she could understand it. Weinstein invited her to his hotel room. She declined and left the gathering.

## 2. *The sexual offenses and the aftermath*

On February 15, 2013, JD1 checked into room 801 at the Mr. C Hotel in Los Angeles. She used a pseudonym rather than her real name, explaining she did so "to be incognito [and] to have [her] privacy because at that time [she] was a public person." Other than her family in Italy, the only person to whom she disclosed her hotel and room number was Vicedomini. On February 16, 2013, the day before the film festival events began, Vicedomini visited her at her hotel. He was staying at a different hotel.

On February 17, 2013, the opening night of the festival, JD1 walked the red carpet at around 7:30 p.m., and then spent time mingling with guests in a "V.I.P. room" inside the theater. Both Vicedomini and Weinstein were in the room. Someone tried to introduce JD1 to Weinstein, and she stated that they had already met. The conversation ended there due to her limited English. She did not discuss her hotel information with anyone in the room. Later, JD1 and the other guests went into the theater for a presentation where actor Al Pacino received an award. At some point during the night's festivities, JD1 took a photo with Al Pacino.

After the awards ceremony, JDI, other members of the Italian team, and VIP guests attended a dinner hosted by Vicedomini at the same property where the theater was located. At trial, JD1 did not recall if Weinstein was at the dinner. According to her testimony, after dinner, she "call[ed her]

limousine driver," and the driver took her to the Mr. C Hotel. Her hotel folio shows no limousine service charge for that day, as it does for other dates during her stay.

JD1 arrived at her room after midnight, on February 18, 2013. She took off her dress, put on a robe, and was about to remove her makeup when the hotel telephone rang. She answered it, and a hotel employee told her she had a guest at the hotel. She said she was not expecting anyone, and the employee told her it was Weinstein. After she reiterated that she was not expecting a guest, Weinstein got on the line, identified himself, and said he had to talk to her. She was confused about why he was there but said she would go downstairs to talk to him. He said no and told her they could not meet in the lobby because he was famous. She said she would talk to him the next day and hung up the phone.

Shortly thereafter, JD1 heard knocking on her hotel room door. Then, she heard Weinstein speaking loudly, identifying himself and telling her to open the door and let him in because he had to talk to her. She was frustrated and confused about how he knew where to find her. After about 20 seconds, she opened the door because she was concerned that people would hear him speaking so loudly in the hallway and she wanted him to stop. She felt ashamed and embarrassed to have a stranger making noise outside her door like that, and she wanted to protect her reputation at the hotel.

When she opened the door, Weinstein walked into her room, which she was not expecting. He told her there was nothing to worry about, he just wanted to talk. He reiterated that he could not meet her downstairs because a lot of people knew him. She sat on the edge of the bed, and he sat in front of

6

her on a chair. She remained frustrated and confused about why he was in her room and how he knew she was at this hotel. She wondered if he had followed her or if he was waiting for her. She did not know anything about him other than that he was "from the industry," but she did not feel afraid. He told her to talk about herself, so she talked about her children and showed him photos of them on her cell phone. They also talked about his children. She told him that her mother was very ill with cancer. He told her that she (JD1) was a good woman.

Weinstein removed his jacket, placed it on a chair, and asked JD1 to give him a massage. She asked him to leave. He moved from the chair to the bed and sat with his back against the pillows. She remained sitting on the edge of the bed. The situation felt awkward and it seemed like he had become a "totally different person" from a few minutes before when they were talking about their children. She wondered if she had given him the wrong impression because of her limited English. She became "more direct" in her approach, continuing to ask him to leave. He replied, " 'Come on. We're just talking. Relax,' " or words to that effect.

He became "more physical," trying to hold her hand. He told her she had a beautiful face, but her breasts were too large for a job in acting. As he said this, he tried to open her robe. Still, she was not afraid. She just thought he was a "super arrogant guy." She moved away from him on the bed, closed her robe, and asked him to leave her room. She told him that nothing was going to happen between them and repeated that she had three children.

He opened his pants and touched himself as he held her hand. She tried to stand up but he held onto her. She started to

panic and cry. He told her there was "nothing happening" and it was "not a big deal." He touched her vagina and asked her if she liked it and if she was wet. He tried to insert his fingers into her vagina but she twisted her body away from him to prevent it. He got off the bed, stood in front of her, and took off his pants. She was terrified. She continued to ask him to leave, and she mentioned her children, as she tried to take her phone out of the pocket of her robe to show him photos of them again. He had trouble getting an erection and said she had "to do something to help." He told her "[t]o suck him and suck his balls."

Weinstein moved back onto the bed and pulled JD1 toward him as she tried to stand up. "His face changed. His eyes changed, his behavior changed." He reiterated that she had to help him. He grabbed her hair, pulled her head to his penis, and placed it in her mouth. She was crying and moving her head from side to side, trying to get away, but he had one hand gripping her hair and the other holding his penis in her mouth. She was afraid he would hurt her so she relented and tried to do as he asked. He moved her face to his testicles and told her "to suck his balls, play with his balls, lick, something like that." She tried to comply, but he became upset because he was still having trouble getting an erection.

He stood up and led her to the bathroom. On the way, he removed her robe. He pushed her into the bathroom sink, stood behind her looking in the mirror, and masturbated as he placed a finger in her vagina and told her to look in the mirror. She moved her body to try to prevent him from continuing to digitally penetrate her. He held her and placed his penis in her vagina, and she said "stop" and "no," as she cried. She continued to move her body such that he could not remain inside her. He continued

to try, telling her, " '[Y]ou are not a little girl. Come on. You like it. Tell me you like it,' " or words to that effect. Eventually, he gave up and masturbated instead, as he told her how beautiful she was and pulled her hair to raise her head up so it was facing the mirror. He ejaculated and cleaned himself with a towel. She picked up her robe from the floor and put it on.

He acted like nothing happened, paying her compliments and acting "happy" and "nice again." Then, he told her it would be better if she did not tell anyone what happened, adding, " 'You do know me.' " She understood this to mean that he was "somebody powerful," and it would be "dangerous for [her]" to talk about it. He said he needed to get some sleep because he had to speak at an event he was hosting the next day. He invited her to the event and said he would send her invitation through "our friend Pascal [Vicedomini]." She did not respond, and he left her room.[3]

JD1 felt "very guilty" and "very humiliated" (and she still felt that way at the time of trial nine and a half years later). She took a long shower and cleaned the room. She found Weinstein's jacket. She felt afraid that she would have to see or interact with him again. She did not know what to do so she called her children's nanny in Italy and spoke with her children. She was too afraid to tell the nanny what happened because Weinstein instructed her not to tell anyone. She was crying hysterically and

---

[3] In 2019, when Weinstein's limousine driver was interviewed by police officers in this case, he stated that he dropped Weinstein off at his hotel at 1:30 a.m. on February 18, 2013. At trial in 2022, the driver testified that he dropped Weinstein off at either 12:30 or 1:00 a.m. on February 18, 2013.

told the nanny "that something really bad happened to [her]" with " 'a very bad man.' "[4]

JD1 charged breakfast to her hotel room on February 18, 2013, as reflected on her hotel folio. She testified that at some point that morning or around lunchtime, she met Vicedomini at his hotel. She told him that she had seen Weinstein, and Vicedomini did not seem surprised. She did not tell him about the sexual offenses due to her feelings of fear, shame, and guilt. But she did tell him that Weinstein had forgotten his jacket. She tried to give the jacket to Vicedomini, but he would not take it. During his conditional examination, Vicedomini testified that he did not recall JD1 ever mentioning the jacket or that anything had happened between her and Weinstein.

Also on the morning of February 18, 2013, JD1 showed Vicedomini a photo of her and Al Pacino, taken the night before, that she had posted on her social media account that morning with the caption, "Thank you Al for a #beautiful evening." They were in the company of an Italian actor/director when JD1 showed Vicedomini the photo.

JD1 returned to the Mr. C Hotel and told an employee at the reception desk that Weinstein had left his jacket. The employee walked into an office behind the desk and called out another employee. This second employee told JD1 that she could leave the jacket with him, and she did.

In the days following the encounter with Weinstein, JD1 drank a lot of alcohol, which was not normal for her. This was

---

[4] JD1 testified that after she returned to Italy she told the nanny more details about what happened with Weinstein, and she confessed to a priest. Neither of these witnesses testified at trial.

her way of "punish[ing]" herself because she felt "very guilty" about how everything unfolded, "most of all" that she opened her hotel room door to Weinstein. She chose not to attend any film festival events on February 18, 2013.

On February 19, 2013, JD1 went to the festival and drank a lot of alcohol in the VIP room. Then, she walked into the theater with two people she knew, who were part of one of Weinstein's movies, and she sat with them. Weinstein came into the theater after and sat near them. JD1 felt like she could not breathe, and she tried to interact with other people so that Weinstein could not interact with her. After the awards ceremony, she left and returned to her hotel.

JD1 testified that she remained in Los Angeles for a few more days to appear at events that her public relations manager was "pushing" her to attend. Her hotel folio indicates that she checked out of her room at the Mr. C Hotel on March 5, 2013.[5]

### 3. Testimony from a hotel guest and hotel employees regarding circumstances at the Mr. C Hotel during JD1's stay

Alexandra De Lara testified at trial for the prosecution. She stayed at the Mr. C Hotel, from February 15-19, 2013, in room 701, directly below JD1's room. At some point during her stay, she was "woken up in the middle of the night by what sounded like an argument" between at least two people, occurring "either above [her] or on the same floor as [her]." She looked out into the hallway to try to determine where the voices were coming from, but she did not locate the source.

---

[5] JD1 returned to the Mr. C Hotel on April 15, 2013, and stayed until April 27, 2013.

11

The defense presented testimony showing that a fire alarm was activated at the Mr. C Hotel at approximately 12:40 a.m. on February 18, 2013. It was triggered by a false alarm in the main kitchen. The alarm lasted for four minutes, and had a loud auditory component and a strobe visual component. Numerous hotel guests lodged complaints about a fire alarm, including JD1's neighbor in room 803. JD1 testified that she did not recall hearing a fire alarm on February 18, 2013.

Hotel records show that in the morning on February 19, 2013, JD1 lodged a complaint with hotel staff that there was dust in her room.

### 4. *JD1 files a police report against Weinstein in Los Angeles in 2017*

In February 2017, JD1 attended the Los Angeles Italia Film Festival with her daughter, Maria (who also testified at trial). At one point during the festivities, Maria told JD1 that someone was looking at JD1. When JD1 turned, she saw Weinstein. JD1 felt "[t]errorized again" and felt like she could not breathe. She and Maria moved away from him. Shortly thereafter, when they arrived at a restaurant for a group dinner, JD1 saw Weinstein and Vicedomini sitting together at a table, so she and Maria walked to a faraway table and sat down. Eventually, Weinstein approached their table and stood next to JD1. They looked at each other and she froze. She felt like she was experiencing the 2013 encounter all over again. Weinstein told someone at the table to move and he sat two chairs away from her. She went to the balcony and when she returned, he was gone.

Later that year, in September 2017, Maria told JD1 that she was being sexually harassed by another student at her high

12

school.  In encouraging a reluctant Maria to report it to the police, JD1 shared that she had been raped and believed it was a mistake that she did not report it.  JD1 promised Maria she would go to the police.

On September 28, 2017, Maria filed a police report.  A couple of weeks later, JD1 told Maria the name of the person who had raped her (Weinstein) and said that "it happened a while back at the Mr. C Hotel."  Maria did not recognize Weinstein's name, so she conducted an internet search.  She recognized him as the man they had seen at the film festival earlier that year.

JD1 filed a police report on October 19, 2017.  She testified that she did not do so earlier because she felt guilt about what happened and she was afraid for her life, her children's lives, and her reputation.

### 5. *Weinstein emails hotel management about JD1*

On October 26, 2017, one week after JD1 reported the crimes, Weinstein emailed Guiseppe Cipriani, the owner of the management company that ran the Mr. C Hotel.  Weinstein attached a photo of JD1 and asked Cipriani whether he or his staff knew her, and instructed Cipriani to be discreet.  Weinstein sent follow-up emails, asking to speak with Cipriani, and telling him not to take calls from a certain woman (identified by her first name only) or her brother.  A couple of months later, Weinstein attempted to arrange a dinner with Cipriani and Cipriani declined.  Weinstein wrote back, "Already cancelled I won't ask again u guys have been amazing to me Wont forget . . . .  [*Sic*.]"  Weinstein also stated in this email that he could introduce Cipriani to a potential investor, acknowledging that he did not know if Cipriani needed such an investor.

13

**6.** ***The Mr. C Hotel's lost-and-found records for February 2013 are not produced in this action***

In 2020, the prosecution subpoenaed the Mr. C Hotel's lost-and-found records for the period January through March 2013. Brando Juris, a former general manager of the hotel, received the subpoena. He provided records from June 2013 and later, but no records for the requested time period. At trial, when the prosecutor asked why he did not send the requested records, he testified: "Because there was -- I think some -- something happened with -- they changed the I.T. company, and I think from the day that the new I.T. company started, they erased two years of data back then." He also testified that if an item, such as a jacket, were returned to hotel personnel, that should have been recorded in the lost-and-found records maintained by hotel security.

In 2020, the prosecution sent another subpoena for the same records to Guy Groves, who was the Director of Safety and Security at the Mr. C Hotel in February 2013. In that position, he was in charge of the lost-and-found records. When prosecutors first spoke with him on May 5, 2020, before service of the subpoena, he said he had personal copies of the lost-and-found records for the period January through March 2013, but he was concerned about producing them without a subpoena because he had signed a separation agreement with the hotel when his position was eliminated. He explained, " 'My family can't eat if I develop a reputation for providing information within the hotel industry that has been previously stated was destroyed [*sic*] .' " He laughed when prosecutors told him about the reported "computer glitch" that had purportedly erased data. He responded, " 'Well, that's what I would say, if I didn't want to

14

turn over the records.' " After he received the subpoena, he told prosecutors that when he accessed his personal backup on his personal computer to search for the records, he found that he was missing the same data as the hotel. At trial he testified: "[I]n 2013, there was an incident with the I.T. company that was actually, you know, handling the computer systems for the hotel. Well, they rebooted the servers and deleted items that were on the desktops of several computers, and including the lost-and-found document."

### 7. *Evidence of uncharged sexual assaults*

The prosecution presented evidence of uncharged sexual assaults by Weinstein. Because Weinstein challenges the court's admission of this evidence, we address it below in the Discussion section of this opinion.

### 8. *Parties' theories of the case*

As pertinent to this appeal, the prosecution advanced the theory that Weinstein was able to locate JD1 at Mr. C Hotel because Vicedomini shared her hotel information with Weinstein to ingratiate himself to Weinstein. The prosecution also argued that the jury could infer consciousness of guilt from evidence that Weinstein told JD1 not to tell anyone what happened and evidence that he tried to suppress incriminating information from the Mr. C Hotel (i.e., the lost-and-found records) by contacting Cipriani after JD1 reported the crimes.

The defense advanced the theory that no sexual encounter occurred between Weinstein and JD1. The defense argued there was evidence indicating JD1 was not in her hotel room at the time she said Weinstein committed the offenses (e.g., no record of a limousine service taking her back to the Mr. C Hotel that night and the fact she did not recall the fire alarm). Relying on

15

Facebook messages exchanged between JD1 and Vicedomini (which we discuss in detail below), the defense argued that JD1 and Vicedomini were in a sexual and romantic relationship, and JD1 spent the night in Vicedomini's hotel room when she said she was with Weinstein.

## C.    Verdicts, Motion for New Trial, and Sentencing

The jury found Weinstein guilty of forcible oral copulation, sexual penetration by a foreign object, and forcible rape. The jury could not reach a unanimous verdict on the factors in aggravation that JD1 was particularly vulnerable or that Weinstein carried out the offenses with planning, sophistication or professionalism, and the court declared a mistrial as to these factors in aggravation.

Weinstein filed a motion for new trial, and the court denied it on grounds we discuss below. Along with the motion, Weinstein submitted three declarations from jurors that he relies on in this appeal. The declarations discuss how the jurors weighed the evidence during their deliberations and how they might have voted if evidence the court excluded were presented to them in the manner characterized by defense counsel. The declarations are improper and we decline to consider them in reviewing Weinstein's contentions. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1264 [" 'As a matter of policy, Evidence Code section 1150, subdivision (a), excludes evidence of the subjective reasoning processes of jurors to impeach their verdicts' "].)[6]

___

[6] In any event, the declarations relate to prejudice, and because we conclude Weinstein has shown no error, the declarations are irrelevant to our resolution of this appeal.

16

The court sentenced Weinstein to 16 years in prison: the upper term of eight years for forcible oral copulation; a consecutive six-year middle term for sexual penetration by a foreign object; and a consecutive two-year term (one-third the middle term) for forcible rape. The court imposed the upper term on count 1 based solely on the aggravating circumstance of Weinstein's prior conviction in New York for sexual offenses. The court ordered Weinstein's sentence to run consecutive to the 23-year sentence imposed in New York.

While this appeal was pending, the New York Court of Appeals vacated Weinstein's New York convictions and remanded the matter for a new trial. We grant Weinstein's request for judicial notice of the opinion of the New York Court of Appeals. (*People v. Weinstein* (N.Y. Apr. 25, 2024, No. 2020-00590) 2024 NY Slip. Op. 02222.)

## DISCUSSION

### A. The Trial Court Did Not Err in Excluding a Set of Facebook Messages Between JD1 and Vicedomini

Weinstein contends the trial court violated his constitutional and state law rights when it excluded some Facebook messages between JD1 and Vicedomini that he sought to introduce during cross-examination of Vicedomini and JD1. He asserts that the excluded messages were "sexually charged," indicating that around the time of the 2013 Los Angeles Italia Film Festival, JD1 and Vicedomini were having a romantic and sexual relationship. He argues that the exclusion of these messages precluded him from (1) challenging the prosecution's theory that Vicedomini provided JD1's hotel and room information to Weinstein, (2) presenting the defense's theory that JD1 was with Vicedomini at his hotel at the time she claimed

17

Weinstein was in her hotel room committing the sexual offenses, and (3) attacking JD1's and Vicedomini's credibility.  In fact, Weinstein *did* make all these arguments to the jury based on other evidence the court admitted, including another set of Facebook messages JD1 and Vicedomini exchanged the day before the film festival commenced, messages that the prosecution unsuccessfully sought to exclude.  Thus, there was no denial of Weinstein's constitutional right to present a defense.  Moreover, as explained below, he forfeited his state law claims by failing to comply with mandatory rape shield procedures (Evid. Code, §§ 782, 1103) before seeking to introduce the Facebook messages during trial.

### 1. *Relevant testimony and proceedings*

#### a. *Vicedomini's conditional examination*

The first time the defense attempted to introduce the Facebook messages that the court excluded was during the conditional examination of Vicedomini, which was held a few weeks before trial commenced.  Accordingly, we begin our discussion of this evidentiary issue with what occurred during the conditional examination.  We note that at trial JD1 testified before the prosecution played the video recording of Vicedomini's conditional examination.

Vicedomini testified in Italian, with the assistance of an interpreter.

During direct examination, the prosecutor asked Vicedomini how he knew JD1, and he responded: "I've known her since 2009.  She was introduced to me by an Italian producer, a very good producer with whom she was working.  And we became friends, and it was always a transparent friendship.  It was always a crystal clear friendship without any moments of crisis.

18

[¶] I never had the feeling that she could have anything against me or anything of that kind." Vicedomini stated he could not recall if he was the person who invited JD1 to the 2013 Los Angeles Italia Film Festival.

Later in the examination, the prosecutor asked Vicedomini about a February 12, 2013 email he sent to Weinstein, inviting Weinstein to participate in the 2013 Los Angeles Italia Film Festival, which was set to begin on February 17, 2013. In the email, Vicedomini stated, in pertinent part: "In addition feel free to suggest me [*sic*] any people to invite to the party which will be a lot of fun. Of course it will be a big pleasure to have you as my very special guest. There are a lot of 'nice' people to meet." The prosecutor asked Vicedomini what he meant by " 'nice' people to meet," and Vicedomini replied: "Interesting people. I meant -- that's what I meant. It was nice people basically because this is all part of the system. It's all part of the -- these types of events. [¶] You're trying to make them seem attractive to someone because there are parties. There are so many events and for him to be able to come to your event you try to say well there are going to be nice people."

The prosecutor then inquired about the circumstances surrounding JD1's attendance at the 2013 Los Angeles Italia Film Festival. The prosecutor introduced the following set of Facebook messages exchanged between Vicedomini and JD1 on February 12, 2013, which were translated from Italian to English:

| JD1: | How are you honey? |
| Vicedomini: | very well and you? |
| JD1: | I've changed my passport !!!! Tomorrow I'm coming home and I arrive on the 16th!!!!!! |

19

Vicedomini:  good.

JD1:  You know, you haven't invited me yet?)))

Vicedomini:  where to

JD1:  To the festival?

Vicedomini:  I didn't understand

JD1:  To your festival!! )

Vicedomini:  I'm not understanding what you're talking about

JD1:  Can I come to your festival?

Vicedomini:  you're really so idiotic

Vicedomini:  I can't wait honey

JD1:  Idiotic, a little) I know. . . .

Vicedomini:  as soon as you're here . . . I'll show you right away how happy I am

JD1:  Ha ha ha!!! Please do!!!!

Vicedomini:  and I won't say anything and it won't matter

Vicedomini:  and I say something and you laugh in my face (*sic*)

Vicedomini:  you're never ok with anything that I say

Vicedomini:  so then we have to find other distractions

Vicedomini:  what do you want to do

JD1:  I'll smile! From happiness and joy!

Based on a review of these Facebook messages, the prosecutor asked Vicedomini to confirm that on February 12, 2013, JD1 indicated she would attend the Italia Film Festival. Vicedomini responded affirmatively and added, "[I]t would have been a pleasure for her to come to the festival.  We've been friends since 2009."  The prosecutor then asked, "And that was the same day you promised Mr. Weinstein that he would meet nice people, correct?"  Vicedomini replied, "I'm sorry to say, but

this is not the type of person I was referring to when I said 'nice people' when you are talking to a producer of that caliber." When the prosecutor again asked Vicedomini to acknowledge that the Facebook message exchange with JD1 and the email to Weinstein both occurred on February 12, 2013, Vicedomini stated, "I don't see any link or connection between the two things. All I did was ask her [JD1] as a dear friend of mine to come to the festival. There's no link between these conversations." Vicedomini acknowledged that the conversations occurred on the same day.

Later, during a break in Vicedomini's testimony, while the parties and the court were discussing the relevance of other documentary evidence the prosecution sought to introduce on direct examination, the prosecutor laid out the prosecution's theory that Vicedomini shared JD1's hotel information with Weinstein "to ingratiate himself to Mr. Weinstein" because he "needed Mr. Weinstein's connections, he needed Mr. Weinstein's stars to come to his film festival or else his film festival would not have relevance."

During cross-examination, Vicedomini testified that when he told Weinstein he could meet " 'nice' people" at the film festival, he meant smart, successful, influential people. He denied that this was a reference "to providing women for sex," specifically JD1.

Defense counsel asked Vicedomini if he had a "close personal relationship" with JD1, and Vicedomini replied: "It was a great friendship. I had a great friendship with her and with her children and over the years I had established a very friendly relationship with her and her family." Defense counsel followed up, "As a matter of fact, Mr. Vicedomini, that friendly relationship went further into romance at one point, didn't it?"

21

The prosecutor objected to the question on the ground of relevance, and the court sustained the objection. Defense counsel asked to be heard, and the court responded, "No." Cross-examination continued.

Defense counsel asked Vicedomini some questions about the February 12, 2013 Facebook messages the prosecutor introduced. Then, defense counsel attempted to introduce the following Facebook messages that Vicedomini and JD1 exchanged on February 12, 2013, immediately after they exchanged the other messages the court admitted on direct examination:

| | |
|---|---|
| Vicedomini: | you really don't appreciate much the way I am |
| Vicedomini: | you're used to it now so you don't appreciate it |
| JD1: | I appreciate you so much |
| Vicedomini: | you don't show it much |
| Vicedomini: | and you don't actively participate in the game |
| Vicedomini: | you always take everything for granted |
| Vicedomini: | and it's a shame |
| JD1: | Yesssssss. . . . You're right!!!!!! |
| JD1: | But it was like this (*sic*) |
| Vicedomini: | just think that while I'm talking to you something is happening to me |
| Vicedomini: | . . . |
| JD1: | Now new life (*sic*) |
| Vicedomini: | what do you wanna do |
| Vicedomini: | that's what happens to me |
| JD1: | Wanna do? |
| JD1: | Nothing! |
| JD1: | You wait! |
| JD1: | ))))) |

| | |
|---|---|
| Vicedomini: | I'd need your beautiful mouth now |
| JD1: | I think I know how to help you) |
| JD1: | I was thinking exactly that) |
| Vicedomini: | You know me too well |
| JD1: | Right? |
| JD1: | Not yet? |
| Vicedomini: | you can just imagine what's happening right now |
| JD1: | Are you touching yourself?!! |
| JD1: | Or are you with someone?????? |
| Vicedomini: | guess |
| JD1: | My imagination soars!!! |
| JD1: | I'm thinking you're not alone!!!!! |

The prosecutor objected on the ground of relevance to the admission of these messages. The court asked defense counsel to explain its theory of relevance. Counsel stated: "Establishes the nature of the relationship such that it would be anathema for Mr. Vicedomini to provide [JD1] as a human being the way that the prosecution has suggested or to provide her room number to Mr. Weinstein as they just indicated in their offer of proof that they expect [JD1] to testify to for purposes of making her available to Mr. Weinstein. [¶] They [Vicedomini and JD1] were in a romantic relationship. They were dating, Your Honor. There is no way logically I think a jury can infer that Mr. Vicedomini would provide [JD1] to Mr. Weinstein as a piece of chattel or otherwise for sexual favors." The court responded, "That's not what it was being offered for, but all that aside, I don't think it's relevant to prove or disprove your assumption." The court added, "I don't know . . . that these messages show that relationship." The court told defense counsel, "I will give you some leeway on

23

this but I'm not going to get into the nitty gritty of the relationship between this witness and [JD1]." Counsel replied, "Understood and I will take the court's guidance and take a step back and see if I can do this in a bit more reserved manner." Cross-examination continued as follows:

"[Defense counsel:] Mr. Vicedomini during the course of the 2013 L.A. Italia Film Festival, was your relationship with [JD1] one of friendship and affection?

"[Vicedomini:] A very great friendship.

"[Defense counsel:] And you felt strongly about that friendship, correct?

"[Vicedomini:] And with all my friends I'm very passionate.

"[Defense counsel:] And you were very passionate and friendly and protective of your relationship with Miss -- with [JD1], correct?

"[Vicedomini:] I'm always very, as I said, I'm very affectionate and very open as a human being until we reach a certain level then it remains within the concept of friendship and but [*sic*] I do believe in a quality relationship. As you said yes, I am protective. I'm very cognizant of the fact that people trust me and that is important to me.

"[Defense counsel:] And I just want to ask one final question on this, Mr. Vicedomini. You did not in any way suggest that you would be providing [JD1] to Harvey Weinstein for sexual favors, correct?

"[Vicedomini:] I would never ever in my life do or think something of that nature. I've had a relationship with Mr. Weinstein of many years. We have done many things together. We've worked together and we've had a quality relationship and never in my life would I have even thought of something like

24

that. I'm a serious and responsible person and we've had a quality relationship." Vicedomini also denied that he provided JD1's hotel room number to Weinstein.

Later in the cross-examination, after inquiring about other topics, defense counsel asked Vicedomini the following additional questions about his relationship with JD1:

"[Defense counsel:] Did [JD1] share details, intimate details with her friend Pas[cal] Vicedomini during the course of your relationship in 2012, 2013, and on?

"[Vicedomini:] I didn't understand the question.

"[Defense counsel:] Back in 2013 and on did you and [JD1] enjoy a relationship in which -- or a friendship, in which she would share details with you about her life, privately?

"[Vicedomini:] No.

"[Defense counsel:] In the text messages that you shared with [JD1], did you have private interaction that was not open for other people to see and read?" The prosecutor objected to this question on grounds of vagueness and relevance. Defense counsel apologized, and the court sustained the objection.

Defense counsel asked Vicedomini if he and JD1 "shared information that was private to the two of" them. Vicedomini responded: "[A]s I said we do have a great friendship and this friendship goes back to 2009. We have a very pleasant relationship. It's a fun relationship. I know her children." Defense counsel asked the following two questions about Vicedomini's relationship with JD1 and then did not ask any more questions on this subject:

"[Defense counsel:] And you shared private information with one another, correct?

"[The prosecutor:] Objection. Vague and relevance.

25

"The court:  I don't think it's irrelevant.  I don't know what 'private' means.

"[Defense counsel:]  Okay.  I'll try it again.

"The court:  So the objection is sustained.

"[Defense counsel:]  You had an open line of communication between the two of you, correct?  Back in 2013 and onward?

"[Vicedomini:]  Very rarely.  Very rarely."

### b.    *JD1's trial testimony*

During JD1's direct examination, when asked how she became associated with the Los Angeles Italia Film Festival, she responded, "I was a friend of and I worked with the founder of the festival," whom she identified as Vicedomini.  Later in her direct examination, she testified that at the time of the 2013 Los Angeles Italia Film Festival, she and Vicedomini had a "friend relationship."

During cross-examination, defense counsel asked JD1 if she went to Vicedomini's hotel room after the film festival events on February 17, 2013, and spent the night there.  She responded, "Absolutely not."  Next, counsel asked, "That's because you and Pascal had a relationship together, didn't you?"  The prosecutor objected on the ground of relevance, the court sustained the objection, and defense counsel asked to approach.  The court granted the request, and a lengthy bench conference ensued.

Defense counsel argued the evidence Weinstein sought to admit about the nature of JD1 and Vicedomini's relationship was "pure impeachment," asserting these witnesses "lied" when they testified they were "just friends" or "colleagues" at the time of the 2013 Los Angeles Italia Film Festival.  Counsel further argued there was circumstantial evidence supporting the defense's theory that JD1 was in Vicedomini's hotel room after midnight on

26

February 18, 2013, the time she said Weinstein sexually assaulted and raped her in her hotel room. Counsel noted, for example, that there was no charge on her hotel folio showing that the hotel's limousine service brought her back to the hotel (or anywhere) that night, as it had on other nights, and there was evidence (including a Facebook message) indicating she was with Vicedomini at some point in the morning on February 18, 2013. Counsel also reiterated the defense theory asserted at Vicedomini's conditional examination that Vicedomini would not have given Weinstein the hotel room number of a woman with whom he himself was having an affair.

The prosecutor argued, "[T]his isn't just an opportunity for the defense to make rank speculation and just assassinate [JD1's] character with no evidence . . . ." Defense counsel responded: "And the prosecution opened this door when they sought information from her on direct about the nature of her relationship. She said[,] 'We were friends.' The prosecution is hiding vital information. We had information they were sexting with each other five days before the event [referencing the February 12, 2013 Facebook messages the court excluded during Vicedomini's conditional examination]. Sexting with each other the day before the event." The latter reference was to the following set of Facebook messages that JD1 and Vicedomini exchanged on February 16, 2013:[7]

JD1:            I'm waiting for you. . .

_____

[7] Defense counsel initially told the court that these messages were exchanged on February 17, 2013—the first day of the film festival—but later acknowledged that because they reflect "UTC," or Coordinated Universal Time, they were in fact exchanged on February 16, 2013 Pacific Standard Time.

| Vicedomini: | on my way love |
|---|---|
| Vicedomini: | it's that I don't know where to buy what you asked me for |
| JD1: | You have to buy((( (*sic*) |
| JD1: | Hurry up . . . There's a surprise waiting for you |

Defense counsel stated: "It's vital I be able to establish circumstantially to the jury that there is an alternative reasonable explanation for all of her story. She was with Pascal [Vicedomini] and she made this up. [¶] It's central to our defense and this has nothing to do with rape shield [law. (See Evid. Code, §§ 1103 & 782.)] It has nothing to do with dragging her through the mud. She is a liar. She said[,] 'We are just friends.' You don't just sext with someone you are just friends with."

The prosecutor disputed the characterization of the messages as "sexting" or as indicative of a romantic relationship, stating: "There is no reference to sex or to any sexual act. There is playful banter between the two of them and there is absolutely no evidence that they had a romantic relationship on either side. There is nothing to say that they were together that night. There is no evidence of it and the defense doesn't just get to assassinate a rape victim's character just because they want to put on a defense with no evidence."

Defense counsel asserted that another Facebook message exchange between JD1 and Vicedomini "maybe three months later" indicated they were in a romantic relationship. Counsel did not reference the date of these messages but described them as follows: "[JD1] and Pascal [Vicedomini] were back in Italy and they texted about going to the, I think it was the Capri Film Festival, and this time he texted her overtly[,] 'You're staying with me. Bring a change of clothes.'" Counsel added: "It's

absurd to even suggest they weren't in a relationship.  And the fact that they were in a relationship, which can be proven, and it's something for the jury to weigh and consider, means that she had a reason and a place to be somewhere else on the night of the 17th and we believe she was, the night of the 17th[,] the morning of the 18th."  Counsel also asserted the prosecution had no evidence JD1 was in her hotel room that night.  The prosecutor noted JD1 had already testified she was there, and that was "evidence."

The court asked defense counsel, "So what are you wanting to put into evidence?"  Counsel referenced some of the February 12, 2013 messages that the court excluded during Vicedomini's conditional examination and some of the February 16, 2013 messages that he was attempting to introduce for the first time.  The court stated that none of these messages establish JD1 was in Vicedomini's hotel on the night of February 17 through the early morning hours of February 18, 2013, and characterized the defense's claim to the contrary as "highly speculative."  The court reasoned it was irrelevant if JD1 and Vicedomini had a sexual relationship if there was no evidence she was with him on the night in question.  The court stated the defense could question JD1 about circumstantial evidence the defense believed showed JD1 was not in her hotel room that night (e.g., limousine service records and evidence that a fire alarm rang at the Mr. C Hotel and JD1 said she did not hear it).

Following a break in the proceedings, the conference between the court and the parties resumed in the judge's chambers.  The prosecutor informed them about a conversation with JD1 during the break, stating:  "She's very concerned that the defense is going to be allowed to ask into her relationship

with Mr. Vicedomini. She said there was a sexual encounter with him at one point in time while she was going through a breakup with her husband. But it was not on this trip. And she is very concerned that she's going to have to divulge this in front of the media. Her kids consume media and she is concerned her kids will find out about that." The timeframe of this encounter is not disclosed in the record, but as Weinstein states in his appellate briefing, it occurred at some point after the festival, and this timeline appears to be undisputed.

Defense counsel continued to argue that the defense should be permitted to question JD1 about the February 12 and 16, 2013 Facebook messages. Counsel also noted, "[T]he fact they had a romantic relationship, that that romantic relationship moved forward, they were still in a romantic relationship several months later when he asks her 'spend the night with me' at, you know, whatever event it was in Italy. I don't even need to get into that. [¶] For the court's edification it wasn't like it was a tryst over that night but even if it were that would still be relevant for the jury to consider."

Defense counsel maintained, "[T]o foreclose this line of cross-examination is to basically take away the entirety of our defense of this particular witness, this victim." The court responded, "The texts don't establish they were getting together that night [February 17, 2013]. They [the texts] were from the night before."

The prosecutor argued the evidence the defense sought to admit was "precluded by the rape shield laws" and the defense was "required to file a motion to seek to admit" it. Defense counsel replied, "This is not rape shield. It is pure impeachment." The court responded, "I don't think her sexual

30

relationship with someone else is pure impeachment." Defense counsel argued that the evidence "impairs her credibility," and the rape shield laws do not "prevent[] a witness [from] being called out on her perjury."

Defense counsel explained that the purpose of introducing this evidence was not to show that JD1 was having sexual relations with another man but to show she was not in her hotel room on the night in question. Counsel referenced the February 16, 2013 Facebook messages and stated, "None of that is graphic but it certainly shows the nature of the relationship, baby, honey, come over. I can't wait to see you, all of those things. That's not protected by the rape shield law." The court questioned whether these messages actually indicated a sexual relationship but stopped short of saying it was an unreasonable inference. The court reiterated that the messages were "not evidence that they were together [at the time in question]. It is an inference that he [defense counsel] wants to draw from the fact that they may have been together the night before."

Defense counsel argued that because there was evidence that JD1 and Vicedomini "were together every single day" from February 16 to February 19, 2013, "It's not a long shot that they may have spent the night together on one or more of those nights, and we have information that they did." The court responded: "Well, that's the part that I think is lacking. And there is a rape shield law for a reason, even if the defense would like to establish otherwise, and I have to take that into consideration. I can't just ignore the fact it exists. So it does mean that it has to be particularly relevant not just inferentially a possibility. I think that I'm compelled to take that into consideration."

31

The court made its ruling and had the following exchange with defense counsel about the ruling:

"The court: All right. I'm going to let you ask during this time period, meaning the 17th and 18th and the time of the Italia Film Festival whether she had an intimate relationship with Mr. Vicedomini and you can use the texts on the 16th, from the 16th. It has to be made clear they are from the 16th.

"[Defense counsel]: Right.

"The court: Which is why my recollection initially that [*sic*] they weren't from the 17th. So whatever she says is what she says.

"[The prosecutor]: The implication --

"The court: You are not getting into whether it's any other point in time she had an intimate relationship with Mr. Vicedomini.

"[Defense counsel]: That's fine."

When cross-examination resumed, defense counsel asked JD1 the following questions:

"[Defense counsel:] When we last left off we were chatting about Pascal Vicedomini and your relationship with Mr. Vicedmoni. [¶] You previously testified that you and Mr. Vicedomini had simply a friendly relationship, a friend relationship I think you said, co-workers, correct?

"[JD1:] We were very close friend [*sic*], co-workers.

"[Defense counsel:] And the truth is you actually had a romantic relationship with Mr. Vicedomini at least in the days leading up to the L.A. Italia Film Festival in 2013, correct?

"[JD1] That's not correct.

32

"[Defense counsel:]  Did you have a romantic relationship with him at or around that time maybe February 16th, 17th, 18th?

"[JD1:]  Can you repeat the question with the date.

"[Defense counsel:]  I want to direct your attention[,] well the easiest way to think about it is the L.A. Italia Festival started on the 17th of February.  I'm going to bracket those days and ask you did you have a romantic relationship with Mr. Vicedomini on the 16th, 17th, 18th during that time frame?

"[JD1:]  No.

"[Defense counsel:]  What was the nature of your relationship with him?

"[JD1:]  Close friends, co-worker.

"[Defense counsel:]  Did you ever have a romantic relationship with Mr. Vicedomini?

"[The prosecutor]:  Objection.  Relevance.

"The court:  Objection is sustained."

Defense counsel then reviewed with JD1 the contents of the February 16, 2013 Facebook message exchange between her and Vicedomini.  JD1 testified that when Vicedomini wrote, " 'on my way love,' " he meant that he was on his way to meet her at her hotel.  She stated that in Italian, the word " 'love' " is a term of affection used to refer to both friends and romantic parters.  Defense counsel asked her what she meant when she wrote that there was a " 'surprise waiting for' " him.  She responded, "I don't remember that.  Probably I took something from Italy to him."  She confirmed that she and Vicedomini did meet at her hotel on February 16, 2013.

### c.    *Relevant defense closing argument*

During argument to the jury, defense counsel's first comments about JD1 were as follows:  "Harvey Weinstein did not rape [JD1].  He was never in her hotel room ever.  The evidence clearly established that not only was he not in her hotel room in the early morning hours of February 18th, 2013; she wasn't in her hotel room on February 18th, 2013."  Counsel stated that JD1 said she took a limousine back to the Mr. C Hotel late on the night in question, but her hotel folio shows no limousine service on February 17 or 18, 2013.  He added:  "There would not be records, however, if she got a ride, for instance, from Pascal [Vicedomini], from the dinner and went back to his hotel.  That would match up with the documents that we have."

Counsel argued, Vicedomini "was sending [JD1] love notes, affectionate texts, in the days and week or so leading up to the L.A. Italia Film Festival.  You saw those text messages."  He further asserted, "The evidence points to the fact that she and Pascal [Vicedomini] were, in fact, involved in a relationship, a loving relationship, a romantic relationship.  Uncontrovertible evidence is that she was in his room the very next morning."  Counsel referenced a message JD1 sent Vicedomini, indicating that she showed him a photo that was taken at the film festival on February 17, 2013, " 'immediately the next morning,' " or February 18, 2013.

Defense counsel also questioned the prosecution's theory that Vicedomini shared JD1's hotel information with Weinstein, asking, "Why would [Vicedomini] give another man his lover's hotel room number?  That's just bizarre."

Later in the argument, defense counsel asserted that a fire alarm "blared" on "[e]very floor" of the Mr. C Hotel during the

time JD1 said Weinstein was in her room committing the sexual offenses. Counsel argued: "[JD1] was interviewed probably six different times. Not once did she ever say anything about a fire alarm. And the reason she didn't say anything about it is because she didn't know about it, and the reason she didn't know about it is because she wasn't there, she was with Pascal [Vicedomini] in his hotel room that night. That's where she was."

### d. *Weinstein's motion for new trial*

After the jury found Weinstein guilty of the sexual offenses involving JD1, he filed a motion for new trial, arguing, among other things, that the court erred when it excluded the February 12, 2013 Facebook messages between JD1 and Vicedomini that he sought to introduce during cross-examination of Vicedomini and JD1. He further asserted that during the conference regarding these messages, "[T]he defense also alerted the Court to May 2013 Facebook messages showing that [JD1] made plans to bring a change of clothes to an event at the Cannes Film Festival so that she could go home with Mr. Vicedomini." Weinstein claimed the trial court "ultimately excluded" the May 2013 Facebook messages.

We disagree with Weinstein's characterization of what occurred during the bench and chambers conference that we summarized above. During the conference, defense counsel referenced messages that JD1 and Vicedomini exchanged a few months after the February 2013 messages that the defense sought to admit; but counsel did not identify the later messages by date or seek to introduce them. Rather, defense counsel told the court, "I don't even need to get into that," and indicated he was referencing the later messages "[f]or the court's edification" regarding the nature of JD1 and Vicedomini's relationship.

35

Moreover, when the court asked defense counsel point-blank, "So what are you wanting to put into evidence," counsel referenced only the February 12 and 16, 2013 messages. The court did not "exclude" the May 2013 messages, as it was never asked to admit them. Nonetheless, Weinstein argued in his motion for new trial that the court erred in excluding them.

Weinstein submitted with his motion for new trial the English translation of a set of May 21, 2013 Facebook messages, which states, in pertinent part:

| | |
|---|---|
| JD1: | Honey I don't know why but my cell doesn't work !!!!! I can write here when there is w f (*sic*) !!! What are you doing? Where can I see you? What are tomorrow's plans? Where? [Lips emoji.] |
| Vicedomini: | Love get a change together because tonight you're coming to my place . . . and tomorrow morning you'll be in cannes [*sic*] straight away |
| Vicedomini: | see you directly at de grisogono (*sic*) |
| JD1: | No I can't. They're organizing everything for me. Today I have to go with them, then maybe during the evening I'll get out of there)))) |
| JD1: | Are you going to dinner? |
| JD1: | I'll come later. |
| Vicedomini: | exactly |
| Vicedomini: | see you there |
| Vicedomini: | bring a change of clothes |
| Vicedomini: | and then we'll leave together |
| JD1: | Yes))) |

At the hearing on the motion for new trial, defense counsel argued about the exclusion of "the text messages," in general, and

did not reference the May 21, 2013 messages, specifically. In denying the motion for new trial, the court concluded: "[T]he evidence with respect to the text messages was properly excluded after an analysis pursuant to Evidence Code section 352, and also because the relevance that you [defense counsel] are saying is that it involved sexual conduct[,] I think this is protected by rape shield law and prohibited."

**2. *Applicable law***

Evidence is admissible only if it is relevant. (Evid. Code,[8] § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) Section 780 provides that "in determining the credibility of a witness," a jury may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to," the "existence or nonexistence of a bias, interest, or other motive"; a "statement made by him that is inconsistent with any part of his testimony at the hearing"; the "existence or nonexistence of any fact testified to by him"; and "[h]is admission of untruthfulness." (§ 780, subds. (f), (h), (i) & (k).)

There are statutory exceptions to the maxim that "all relevant evidence is admissible." (§ 351.) Under section 352, for example, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time

_____

[8] Undesignated statutory references are to the Evidence Code.

37

or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Under California's rape shield law, in a criminal prosecution charging rape or other sexual offenses, a defendant who seeks to offer "evidence of sexual conduct of the complaining witness," in order "to attack the credibility of the complaining witness" under section 780, must comply with the procedures outlined in section 782. (§§ 782, subds. (a) & (c)(1), 1103, subd. (c)(1) & (5); *People v. Fontana* (2010) 49 Cal.4th 351, 354, 362 (*Fontana*); *People v. Franklin* (1994) 25 Cal.App.4th 328, 334 (*Franklin*) [section 782 "specifies a procedure which *must* be followed before a defendant being prosecuted for a sexual offense will be allowed to attack the credibility of the alleged victim by presenting evidence of that witness's sexual conduct"], italics added.) "[S]exual conduct, as that term is used in sections 782 and 1103, encompasses any behavior that reflects the actor's or speaker's willingness to engage in sexual activity." (*Franklin*, at p. 334, fn. omitted.)

To comply with section 782, "First, the defendant must file a written motion and an offer of proof detailing the relevancy of the evidence. [Citation.] If the court finds the offer sufficient, it shall order a hearing out of the presence of the jury to allow questioning of the complaining witness regarding the offer of proof. [Citation.] If the court finds the evidence relevant under section 780 and admissible under section 352, the court may make an order stating what evidence may be introduced by the defendant and what questions are permitted." (*Fontana, supra*, 49 Cal.4th at p. 354, citing § 782, subd. (a)(1)-(4).)

The "discretion afforded by Evidence Code section 782," is to be exercised " 'narrowly.' " (*Fontana, supra*, 49 Cal.4th at p.

362.) Our Supreme Court has "emphasize[d] that '[g]reat care must be taken to insure that this exception to the general rule barring evidence of a complaining witness'[s] prior sexual conduct . . . does not impermissibly encroach upon the rule itself and become a "back door" for admitting otherwise inadmissible evidence.' " (*Id.* at p. 363; *People v. Chandler* (1997) 56 Cal.App.4th 703, 708 (*Chandler*) ["By narrowly exercising the discretion conferred upon the trial court in this screening process, California courts have not allowed the credibility exception in the rape shield statutes to result in an undermining of the legislative intent to limit public exposure of the victim's prior sexual history. [Citations.] Thus, the credibility exception has been utilized sparingly . . . ."].)

"A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion." (*Chandler*, *supra*, 56 Cal.App.4th at p. 711.) A defendant who fails to file the requisite motion under section 782, however, "may not . . . complain of error" on appeal regarding the trial court's exclusion of the evidence at trial on other grounds, such as relevance. (*People v. Sims* (1976) 64 Cal.App.3d 544, 554 (*Sims*).)

### 3. *By failing to comply with rape shield law, Weinstein forfeited his claim that the trial court abused its discretion in excluding some of the February 12, 2013 Facebook messages*

Weinstein offered the February 12, 2013 Facebook messages to attack JD1's credibility. He claims this evidence tended to show JD1 engaged in sexual conduct with Vicedomini and therefore impeached her testimony that she and Vicedomini were just friends or colleagues and that she was in her own hotel

39

room in the early morning hours of February 18, 2013.  However, he did not file the requisite written motion under section 782. Therefore, he will not now be heard to complain of error in the exclusion of this evidence.

On appeal, Weinstein characterizes the excluded February 12, 2013 messages as a "sexual" conversation between JD1 and Vicedomini, that demonstrated a "sexual relationship" between them, and "suggested that Vicedomini's motivation for inviting JD1 [to the Los Angeles Italia Film Festival] was for his *own* sexual pleasure."  He argues that rape shield procedures were inapplicable because he "never sought to attack JD1's credibility based on her 'sexual conduct,'" but rather, he "sought to attack JD1's credibility by showing that she *lied* to the jury about material and relevant facts."  To that end, he maintains that he sought to introduce this evidence to show:  "(1) the prosecution's theory that [Vicedomini] invited JD1 to the festival for [Weinstein]'s sexual benefit and provided her hotel information to [Weinstein] was unlikely; (2) JD1 was plausibly with Vicedomini in *his* hotel room on February 18, 2013 when the fire alarms were blaring in her hotel room; and (3) she repeatedly misled the jury about her relationship with Vicedomini."

During JD1's testimony, when Weinstein tried to introduce the messages, defense counsel explained to the trial court that Weinstein wanted to use the messages for "pure impeachment," to "call[] out" JD1 "on her perjury."  Counsel argued that the messages "impair[ed] her credibility" by showing that she "lied" when she testified that she and Vicedomini were "just" friends or coworkers and provided "an alternative reasonable explanation for all [of] her story," i.e., that "[s]he was with [Vicedomini] and she made this up."

40

Weinstein's offer of proof regarding this evidence and its proposed use falls squarely within section 782's parameters: "evidence of sexual conduct of the complaining witness [that] is offered to attack the credibility of the complaining witness under [s]ection 780." (§ 782, subd. (a).) As he articulated in his opening appellate brief, "Evidence Code section 780 expressly states that a jury may consider *in determining the credibility of a witness* any manner that has any tendency in reason to prove or disprove the truthfulness of his testimony, including the existence of bias, interest, or other motive, *the existence of a prior inconsistent statement of the witness, the existence or non-existence of any fact testified to by him, and his admission of untruthfulness*." (Italics added.) Weinstein sought to argue to the jury that these messages described sexual conduct, and from this evidence of purported sexual conduct the jury should infer that JD1 was engaged in a sexual relationship with Vicedomini, and therefore she was not credible when she testified that she and Vicedomini were friends and colleagues and that she was in her hotel room on the night of February 17, 2013, among other things. In other words, he sought to use evidence of her purported sexual conduct to "disprove the truthfulness of h[er] testimony" by showing the "nonexistence of a fact testified to by h[er]." (§ 780, subd. (i).) Thus, a written motion was required, and it was for the court to decide *under the procedures outlined in section 782* whether the evidence was admissible.[9]

_____

[9] Although we decide this issue based on Weinstein's failure to comply with rape shield procedures and therefore do not need to reach the merits of the trial court's exclusion of this evidence, we note that the conclusion Weinstein wanted the jury to draw from the evidence depends on multiple links in a chain of

In arguing that rape shield procedures were inapplicable, Weinstein relies on two cases that are inapposite, *Franklin*, *supra*, 25 Cal.App.4th 328 and *People v. Tidwell* (2008) 163 Cal.App.4th 1447 (*Tidwell*). In *Franklin*, the Court of Appeal concluded, among other things, that the defendant, who was appealing his conviction for continuous sexual abuse of a child, was not required to comply with section 782's procedures before introducing at trial evidence that the complaining witness had made "a prior false accusation of sexual molestation" against another individual. (*Franklin*, at pp. 330, 335.) The court reasoned, "The instance of conduct being placed before the jury as bearing on credibility is the making of the false statement, not the sexual conduct which is the content of the statement. [¶] Even though the content of the statement has to do with sexual conduct, the sexual conduct is not the fact from which the jury is asked to draw an inference about the witness's credibility. The jury is asked to draw an inference about the witness's credibility from the fact that she stated as true something that was false." (*Id*. at p. 335.) The appellate court agreed with the defendant's contention that the trial court erroneously applied section 782 in excluding the evidence, but did not reverse the judgment because

---

speculative inferences. Evidence that "leads only to speculative inferences" is irrelevant (*People v. Morrison* (2004) 34 Cal.4th 698, 711 (*Morrison*)), and a court " 'has no discretion to admit irrelevant evidence.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 904 (*Alexander*), quoting *People v. Babbitt* (1988) 45 Cal.3d 660, 681 (*Babbit*).) Were we to address the merits, we would conclude the trial court did not abuse its discretion in excluding the messages based on irrelevance, as well as a substantial danger of confusing the issues or misleading the jury under section 352.

the exclusion of the evidence did not result in a miscarriage of justice. (*Id.* at pp. 336-337.)

In *Tidwell*, the defendant filed a section 782 motion before his trial for rape and other offenses, seeking permission to introduce evidence that the complaining witness had made prior false complaints of rape. (*Tidwell*, *supra*, 163 Cal.App.4th at pp. 1448, 1452.) After holding an evidentiary hearing on the motion, the trial court excluded the evidence, finding it inadmissible under section 352. (*Id.* at p. 1454.) On appeal, the defendant argued the trial court erred in not allowing him to question the complaining witness at the evidentiary hearing pursuant to section 782. (*Id.* at p. 1452.) The Court of Appeal held, "Section 782 was inapplicable because it was [the complaining witness]'s allegedly false complaints that the defense sought to use as impeachment evidence, not her prior sexual conduct or willingness to engage in sexual activity. Under these circumstances, the language of section 782 does not apply and the procedure mandated by section 782 is unnecessary." (*Id.* at p. 1456.) The court concluded the evidence was properly excluded under section 352 because "the evidence concerning falsity of the rape complaints" was "weak[]" and "admitting the evidence would have resulted in an undue consumption of time." (*Id.* at p. 1458.)

Here, Weinstein did not seek to have the jury draw credibility inferences based on a false report of sexual conduct, as the defendants did in *Franklin* and *Tidwell*. Rather, he sought to have the jury draw the inference that JD1 was lying about the true nature of her relationship with Vicedomini and her whereabouts on the night in question, among other things, based on messages purportedly evidencing her willingness to engage in sexual conduct with Vicedomini and describing specific acts of

43

sexual conduct. By failing to comply with section 782's mandatory procedures, he forfeited his challenge on appeal to the trial court's exclusion of the evidence. (See *Sims*, *supra*, 64 Cal.App.3d at p. 554.)

Section 782's procedures ensure that the court has an opportunity to consider the relevance of the proposed evidence of the complaining witness's sexual conduct, and any section 352 concerns, and determine "the nature of the questions to be permitted" during the witness's examination, *before* the witness takes the stand. (See § 782, subd. (a)(4).) The circumstances that unfolded during Vicedomini's conditional examination and at trial due to Weinstein's noncompliance with these procedures illustrate why they are so important. Weinstein placed the trial court in the difficult position of evaluating these issues, weighing the competing considerations, and ruling on the permissible scope of cross-examination in the middle of the witness's testimony. The lengthy bench and chambers conferences during JD1's cross-examination, while the jury was waiting, demonstrate why compliance with section 782 is necessary.

Without citation to authority, Weinstein argues *the prosecution* forfeited "its position" that the evidence was barred by rape shield law because the prosecution did not object to the evidence on this ground when Weinstein first sought to introduce it before trial at Vicedomini's conditional examination, objecting instead based on relevance. It was Weinstein's obligation, as the party who sought to offer the evidence, to comply with rape shield procedures, and the prosecution had no obligation to prompt Weinstein's compliance. We note that during trial, when Weinstein sought to offer the evidence on cross-examination of JD1, the prosecutor pointed out that Weinstein had not filed the

44

requisite motion. In response, Weinstein argued rape shield law was inapplicable. As explained, Weinstein skipped a step when he failed to file the requisite motion, and thus, he forfeited his claim of error.

Weinstein also points out that the trial court did not exclude the evidence because he failed to comply with rape shield procedures. The court conducted a merits analysis before excluding the evidence. Weinstein cites no authority that precludes us from finding forfeiture under these circumstances.

Here, there was a real danger the jury would consider the messages solely for Weinstein's assertion that they showed an extramarital sexual affair between JD1 and Vicedomini— precisely what rape shield protects against. Weinstein attempted to evade these protections by seeking to introduce the evidence *in the middle of* witness examination, without a written motion and an evidentiary hearing—procedural safeguards that exist to allow the court to take " 'great care' " in evaluating the admissibility of the evidence instead of deciding "on the fly" whether the "exception to the general rule barring evidence of a complaining witness'[s] prior sexual conduct" applies. (*Fontana*, *supra*, 49 Cal.4th at p. 363.) We decline to excuse or make light of his noncompliance by reviewing the merits of the court's evidentiary ruling despite the forfeiture.

**4.** ***The evidence the court admitted allowed Weinstein to challenge the prosecution's theory of the case, present his defense, and challenge the witness' credibility; his claim to the contrary is unsupported by the record***

As set forth in more detail above, during JD1's cross-examination, the defense sought to introduce, over the

45

prosecution's objection, not only the February 12 messages, but also the February 16, 2013 Facebook messages between JD1 and Vicedomini. During the chambers conference regarding this matter, defense counsel claimed that the purpose of introducing this evidence was not to show that JD1 was having sexual relations with another man but to show she was not in her hotel room on the night in question. To that end, counsel referenced the February 16 messages and stated, "None of that is graphic but it certainly shows the nature of the relationship, baby, honey, come over. I can't wait to see you, all of those things. That's not protected by the rape shield law." When the court ruled that the defense could introduce the February 16 messages and ask JD1 "whether she had an intimate relationship" with Vicedomini on February 17 or 18, 2013, defense counsel responded, "That's fine," indicating the defense was satisfied with the ruling. On cross-examination, JD1 denied she was in a "romantic relationship" (which was the way defense counsel characterized the relationship in its questions) with Vicedomini during the timeframe February 16-18, 2013. She also denied she spent the night in Vicedomini's hotel room from February 17-18, 2013.

During Vicedomini's cross-examination, the defense explained to the court that it wanted to introduce the February 12, 2013 messages to show the nature of the relationship between JD1 and Vicedomini and to draw the inference that Vicedomini would not have provided Weinstein with JD1's hotel information. The court excluded the messages on relevance grounds but told the defense, "I will give you some leeway on this but I'm not going to get into the nitty gritty of the relationship between the witness and [JD1]." Defense counsel responded, "Understood and I will take the court's guidance and take a step back and see if I can do

this in a bit more reserved manner." Defense counsel asked Vicedomini if he was "protective of [his] relationship with [JD1]," and he responded affirmatively. Counsel also asked if he had "in any way suggest[ed] that [he] would be providing [JD1] to Harvey Weinstein for sexual favors," and Vicedomini vehemently denied this. Vicedomini also denied that he provided JD1's hotel room number to Weinstein. Counsel did not ask Vicedomini if he was with JD1 overnight from February 17-18, 2013.

During closing argument, the defense asserted, among other things: (1) that there was evidence indicating JD1 did not spend the night in her hotel room from February 17-18, 2013 (e.g., the lack of records indicating she took a limousine back to the Mr. C Hotel in the evening on February 17 or in the early morning hours on February 18; evidence that a fire alarm rang in the hotel after midnight on February 18 but she did not hear it; and a Facebook message indicating she was with Vicedomini at his hotel at some point in the morning on February 18); and (2) that the Facebook messages the court admitted, which the defense referred to as "love notes, affectionate texts," indicated JD1 was in a romantic relationship with Vicedomini. The defense argued to the jury that reasonable inferences from this evidence were: (1) that Vicedomini would not "give another man his lover's hotel room number"; and (2) that JD1 was with Vicedomini in his hotel room at the time she said Weinstein committed the sexual offenses against her in her hotel room.

The court's application of California statutory rules of evidence did not infringe on Weinstein's constitutional rights to challenge the prosecution's case, present a defense, and confront the witnesses against him. (See *People v. Turner* (2020) 10 Cal.5th 786, 818 [" 'As a general matter, the ordinary rules of

47

evidence do not impermissibly infringe on the accused's right to present a defense' "]; *Babbitt, supra*, 45 Cal.3d at p. 683.)

### 5. *Weinstein did not offer the May 21, 2013 messages at trial*

Weinstein contends the trial court erred in excluding May 21, 2013 Facebook messages between JD1 and Vicedomini. We cannot review this claim on the merits for the simple reason that Weinstein never sought to introduce these messages.

As noted above, during the bench and chambers conferences regarding the defense's request to introduce the February 12 and 16, 2013 Facebook messages, defense counsel referenced messages that JD1 and Vicedomini exchanged a few months later. Counsel represented that in the messages, Vicedomini asked JD1 to spend the night with him at another film festival. He did not identify the date of these later messages or seek to introduce them. Rather, he told the court, "I don't even need to get into that," and indicated he was referencing the later messages "[f]or the court's edification" regarding the nature of JD1 and Vicedomini's relationship. Moreover, when the court asked defense counsel to specify the messages Weinstein wanted to introduce, counsel referenced the February 12 and 16, 2013 messages, but not the May 21, 2013 messages. The court did not "exclude" the messages as it was never asked to admit them. "[T]he absence of an adverse ruling precludes any appellate challenge." (*People v. Samayoa* (1997) 15 Cal.4th 795, 837 ["defendant never sought to introduce evidence that assertedly would have been excluded under the prosecution's [in limine] memorandum, and hence the trial court was never required to rule upon the scope of admissible expert testimony relating to defendant's state of mind"].)

The first time the defense identified these messages by date and presented them to the court was in connection with Weinstein's motion for new trial. The messages (which are quoted above), indicate that Vicedomini and JD1 were attempting to coordinate their schedules for that evening; that Vicedomini told JD1 to bring a change of clothes "because tonight you're coming to my place"; refer to JD1's attendance at the Cannes Film Festival the next day; refer to the two of them meeting at a dinner; and refer to "leav[ing] together."

Weinstein argues that, to the extent we conclude his claim regarding the May 21, 2013 messages is forfeited, we should nonetheless review the claim on the merits because it would have been futile for him to pursue introduction of these messages given the court's exclusion of other evidence he sought to introduce. In support of this argument, he cites cases addressing whether a claim of prosecutorial misconduct is forfeited where the defendant fails to object in the trial court. (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*); *People v. Hill* (1998) 17 Cal.4th 800, 820; *People v. Arias* (1996) 13 Cal.4th 92, 159.) This is a very different situation. Here, the court did not have an opportunity to review the messages for itself and decide whether they were admissible because the defense did not present them to the court before or during trial. Accordingly, for us to conclude it would have been futile for the defense to pursue introduction of these messages, our conclusion would be based on pure speculation.

Because the defense did not offer the May 21, 2013 messages for admission at trial, there is no claim for us to review regarding admission of this evidence.

49

**B.** **Weinstein Has Not Demonstrated That the Prosecutor Knowingly Elicited False Testimony About the Nature of JD1 and Vicedomini's Relationship and Failed to Correct It**

Weinstein asserts, "The prosecution knew that JD1 and Vicedomini were engaged in a sexual relationship at the time of the film festival but elicited false testimony from both witnesses that characterized the relationship as platonic and/or a working relationship." He contends his due process rights "were violated when the prosecution misled the jury with false testimony and then argued the false facts to the jury." Because Weinstein has not established that the testimony was false, his contention is without merit.

### 1. *Applicable law*

"[A] conviction obtained through use of false evidence, known to be such by representatives of the [s]tate, must fall under the Fourteenth Amendment [citations]. The same result obtains when the [s]tate, although not soliciting false evidence, allows it to go uncorrected when it appears." (*Napue v. Illinois* (1959) 360 U.S. 264, 269.) In other words, "[A] conviction knowingly 'obtained through use of false evidence' violates the Fourteenth Amendment's Due Process Clause." (*Glossip v. Oklahoma* (2025) 604 U.S. 226, 246.) "To establish a *Napue* violation, a defendant must show: (1) that the testimony was actually false, (2) that the government knew or should have known that it was false, and (3) that the testimony was material, meaning there is a 'reasonable likelihood that the false testimony could have affected the judgment of the jury.' " (*U.S. v. Renzi* (9th Cir. 2014) 769 F.3d 731, 751; *Dickey v. Davis* (9th Cir. 2023) 69 F.4th 624, 636.)

50

The Attorney General argues that Weinstein forfeited his claim of *Napue* error by not "rais[ing] a *Napue* objection at trial or object[ing] to the prosecutor's comments during argument." (See, e.g. *People v. Carrasco* (2014) 59 Cal.4th 924, 966-967 [because the defense knew the witness's testimony was false, *Napue* claim was forfeited by failure to object].) Although Weinstein did not raise an objection at trial under *Napue* specifically, we address his claim on the merits because defense counsel made clear during trial that it was Weinstein's position that JD1 and Vicedomini lied about the nature of their relationship.

### 2. *Analysis*

The claim of *Napue* error fails because Weinstein has not shown that any testimony was false. There is no evidence, even considering the excluded messages, that establishes that JD1 or Vicedomini lied when they characterized their relationship as a friendship. To the extent they had a sexual encounter, as JD1 told the prosecutor they did some time when she and her husband were going through a breakup, this does not mean either of them considered the relationship something other than a friendship. Had the defense asked JD1 if she *ever* had a sexual encounter with Vicedomini (if the defense had followed rape shield procedures and been permitted to ask such a question), and she answered no, that would have been false (to the extent the prosecutor's representation to the defense and the court about JD1's statement accurately described what occurred between her and Vicedomini). The court permitted the defense to ask whether JD1 and Vicedomini had an "intimate relationship" on February 16th, 17th or 18th. The defense asked JD1 if she had a "romantic relationship" with Vicedomini on any of those dates, and if she

51

stayed overnight with Vicedomini from February 17-18, 2013, and she answered no to both questions. There is nothing in the record establishing that either of these answers was false.

Weinstein asks us to accept his characterization of the relationship as truth based on inferences he draws from the evidence. Our task, however, is to determine whether any testimony was demonstrably, actually false. We conclude the record establishes no such false testimony. Accordingly, the prosecutor did not err in arguing the challenged testimony to the jury.

### C. The Trial Court Did Not Preclude Weinstein From Exploring Whether JD1 Had a Financial Motivation or Interest in the Outcome of the Criminal Trial

Weinstein contends the trial court violated his constitutional and state law rights to present a defense when, "Without explanation, the trial court barred defense counsel from exploring JD1's financial interest in the outcome of trial." He further argues that his constitutional right to a fair trial was "infringed" when the prosecutor "told the jury that there was 'zero' evidence that JD1 had a financial motivation – an assertion that [he] had no ability to refute." The record does not support Weinstein's claims of error.

#### 1. *Relevant testimony and proceedings*

During cross-examination, defense counsel asked JD1 about a photograph of her and the actor Al Pacino, taken during the 2013 Los Angeles Italia Film Festival, that she posted on a social media account. The following exchange ensued:

"[Defense counsel:] The reason that you sought out posts and photographs -- let me reverse that -- photographs and then

52

posts with rich powerful influential people is because that would help you as a social media influence, for instance; correct?

"[JD1:]  I didn't see it that way.

"[Defense counsel:]  'Look at me.  I'm hanging out on yachts with rich people.  Is that great.'

"[JD1:]  I was rich at that time, very wealthy.  I didn't need that.

"[Defense counsel:]  As rich as Al Pacino?

"[JD1:]  As rich as Al Pacino.

"[Defense counsel:]  My goodness.

"[JD1:]  Uh-huh.

"[Defense counsel:]  Congratulations."

The following day, when cross-examination resumed, defense counsel began:

"[Defense counsel:]  I want to pick up on something that you mentioned yesterday just to sort of flesh that out very briefly, if you would bear with me.  [¶]  We talked a little bit about 2013, 2012, and that time frame in your life and you made a statement yesterday that you were wealthier than Al Pacino.  I think everybody remembers that.  [¶]  You recall that, correct?

"[JD1:]  I was saying that I was wealthy and --

"[Defense counsel:]  Certainly nothing wrong with that.

"[JD1]:  It was I married a wealthy man.  Not my wealth.

"[Defense counsel:]  Good for you.  That's not the case today however though?

"[The prosecutor:]  Objection.  Irrelevant.

"The court:  Objection sustained.

"[Defense counsel]:  Isn't it true you had a conversation with [the prosecutor] and a detective just a few days ago and you indicated some, a little bit of financial distress?

"[The prosecutor]: Objection. Relevance.

"The court: Objection is sustained.

"[Defense counsel]: May I approach?

"The court: Not right now. Keep it in mind."

Defense counsel did not revisit the issue with the trial court. Nor did counsel ask JD1 whether she had a financial motivation in accusing Weinstein of the crimes or in testifying against him at trial, or whether she had a financial interest in the outcome of the criminal trial.

During closing argument, defense counsel asserted, "This trial has been revelatory, and what it has revealed is that fame and fortune attracts fame and fortune seekers. And that, folks, is why we're here today." Counsel further argued that the charged offenses involving JD1 "just didn't happen," adding, "She made the story up for reasons we may never know. Maybe we could guess."

In rebuttal, the prosecutor responded:

"All right. So then [defense counsel] says to you, 'Well, there's a lot of fame seekers. There's a lot of money seekers.' Well, great. We all understand that, theoretically, those two things could be motivations. Theoretically, yes, that could be a motivation. If that's a possible motivation, what do you do when you have a victim on the stand prepared to answer questions for two days for you? You ask her those questions. And then [defense counsel] says, 'Well, I guess we'll never know. We'll never know.' Well, you could have asked her.

"Is there any evidence -- okay. So fame; right? Is there any evidence in this trial – we've been here eight weeks. Do you have any evidence that [JD1] sought fame? Any evidence? Zero. Do you have any evidence that she sought wealth? We're five years

past 2017 and Me Too.  Do you have a single shred of evidence that [JD1] sought wealth?  Nothing.  Zero."

The prosecutor also queried, "[W]here is the evidence that she has any motivation other than to come in and tell you the truth so she can get justice for what he did to her?  Where is the evidence of that?"  Defense counsel did not object to any part of the prosecutor's argument.

In support of this contention that the trial court erred in precluding him from exploring JD1's financial motivation and interest, Weinstein cites to an exhibit he submitted with his motion for new trial.  In the motion, he described the document as a detective's "updated chrono" that the prosecution produced in discovery.  Included in the chrono is an entry regarding a meeting with the detective, prosecutors, and JD1 concerning potential dates for her trial testimony.  The entry states that during the meeting, which occurred just under a month before her testimony commenced, they "discussed [that] she recently had been hacked, and was having financial difficulties due to unsuccessful business ventures leading to possible eviction and inability to provide for her family.  She worked with her attorney on these issues including providing financial stability with her living situation."  It appears that this is the "conversation" to which defense counsel was referring when he questioned JD1 during cross-examination, as set forth above.

Weinstein also cites to a portion of JD1's grand jury testimony during which the prosecutor asked her if, in 2017, she had a discussion with a particular person about "potentially getting money from Mr. Weinstein" and "receiving $1 million in a settlement based on a claim of sexual assault being made."  JD1 denied that the discussion took place.  The prosecutor then asked

if she had ever filed a civil action against Weinstein, and she responded, "Never.  And I will never do that."

### 2.    *Analysis*

The record does not demonstrate error.  Weinstein never asked JD1 whether she had a financial motivation in accusing Weinstein of the crimes or in testifying against him at trial, or whether she had a financial interest in the outcome of the criminal trial.  Nor did the trial court exclude such testimony.

The court sustained the prosecution's relevance objections to two questions the defense asked JD1 about her financial condition at the time of trial.  When defense counsel asked to approach, the court stated, "Not right now.  Keep it in mind.  During subsequent bench and chambers conferences that occurred during JD1's testimony, defense counsel never made an offer of proof as to why the testimony was relevant or explained to the court that the defense wanted to show that JD1 had a financial motivation or interest related to the outcome of the criminal trial.  The record does not show that it would have been futile for the defense to pursue introduction of this evidence.  In fact, the record shows the opposite, as the court expressly invited the defense to revisit the issue later, but the defense declined the invitation.

We reject Weinstein's assertion that "Due Process precluded the prosecutor from asking the jury to credit JD1's testimony and convict [Weinstein] because he failed to introduce evidence of her financial motivations when the evidence was excluded [o]n the prosecutor's motion."  As a threshold matter, we note the defense did not object to the prosecutor's argument.  "As a general rule, ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the

same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' " (*People v. Centeno*, *supra*, 60 Cal.4th at p. 674.) We address the claim on the merits, notwithstanding the general rule, as Weinstein appears to be asserting that his substantial rights were affected by the asserted error.  (See Pen. Code, § 1259.)

With respect to his complaint about the prosecutor's argument, Weinstein misinterprets the record.  In response to the defense's argument to the jury that the complaining witnesses were "fame and fortune seekers," the prosecutor argued there was no evidence that JD1 had sought fame or wealth.  There is nothing false about this argument.  Weinstein does not claim on appeal that there is any evidence that JD1 did anything *prior to trial* in an attempt to seek fame or wealth (e.g., send a demand letter, file a lawsuit, go to the press), which is what the prosecutor was saying.  The prosecutor further argued, "[W]here is the evidence that she has any motivation other than to come in and tell you the truth so she can get justice for what he did to her?  Where is the evidence of that?"  Weinstein did not ask JD1 about her "motivation," and the trial court did not make any ruling precluding him from doing so.  Thus, he has not demonstrated error.

**D.    The Trial Court Did Not Abuse its Discretion in Denying Weinstein's Motion for New Trial Based on Evidence That JD1 Filed a Civil Action for Damages Against Him After the Jury Returned the Guilty Verdicts**

### 1.    *Relevant proceedings*

One of the grounds on which Weinstein moved for new trial was his claim of "newly discovered evidence," namely, the civil lawsuit JD1 filed against Weinstein eight weeks after the jury returned the guilty verdicts.  (Pen. Code, § 1181, subd. (8).)  Weinstein argued in his motion that the "civil complaint filed by [JD1] has revealed that she intended to seek financial gain from Mr. Weinstein, and had a motivation to lie about her allegations during the trial and in front of the grand jury."  At the hearing on the motion, the trial court rejected Weinstein's argument, stating, "I believe [JD1]'s decision with respect to civil litigation is something that occurred after the trial took place.  I don't know the reason for the timing.  You can speculate as to the reason for the timing.  You can speculate as to what her motivations were at the time of trial, but the reality is that it is something that took place after the trial occurred and I don't think it makes her testimony false."  The court denied the motion for new trial.

### 2.    *Applicable law*

A trial court may grant a motion for new trial, "When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at trial."  (Pen. Code, § 1181, subd. (8).)  "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  ' "1.  That the evidence, and not merely its materiality, be newly discovered; 2.  That the

58

evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328; *People v. O'Malley* (2016) 62 Cal.4th 944, 1016-1017.)

" '[T]he trial court has broad discretion in ruling on a new trial motion,' and its 'ruling will be disturbed only for clear abuse of that discretion.' [Citation.] In addition, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.)

" 'Numerous cases hold that a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant.' " (*People v. Rafael B.D.R.* (2024) 101 Cal.App.5th 385, 396; *People v. Hall* (2010) 187 Cal.App.4th 282, 298.) On the other hand, the "general rule" is "that a new trial should not be granted ' "where the only value of the newly discovered testimony is as impeaching evidence" or to contradict a witness of the opposing party.' " *Rafael B.D.R.*, at p. 397, quoting *Hall*, at p. 299.)

### 3. *Analysis*

The trial court did not abuse its discretion in declining to grant a new trial based on evidence that JD1 filed a civil action for damages against Weinstein *after* trial. Weinstein could not have attacked JD1's credibility with this evidence because it did not exist at the time of trial. Moreover, even if this evidence could have been placed before the jury, such impeachment

59

evidence does not merit a new trial, as the authorities cited above indicate.

In any event, this posttrial evidence does not show that any of JD1's trial testimony was false, as the defense did not ask her if she had a financial motivation or interest in the outcome of the criminal trial, as already discussed. JD1's grand jury testimony that she had not filed a lawsuit against Weinstein and "will never do that" is irrelevant in challenging his convictions because it was not introduced at trial. Finally, the posttrial civil action does not show that JD1 falsely accused Weinstein of the crimes, and it was not unreasonable for the trial court to reject this speculative claim.[10]

E.    **The Trial Court Did Not Abuse its Discretion in Allowing Vicedomini's Conditional Examination to be Conducted by Video Conference, and Weinstein Forfeited His Contention on Appeal That the Admission of the Video at Trial Violated His Constitutional Rights**

Weinstein contends, "The trial court erred when it granted the prosecution's motion for a conditional examination based on dubious 'health' concerns raised by Vicedomini at the eleventh hour." He further contends that admission of the conditional examination at trial violated his federal and state constitutional rights to confront a witness.

---

[10] We deny Weinstein's request for judicial notice of motions filed in the civil action.

60

#### 1.    *Relevant proceedings*

Because Vicedomini was a material witness who lived in Italy, the parties agreed to conduct a conditional examination of him in March 2022, when he planned to be in Los Angeles for the Italia Film Festival.  However, on February 10, 2022, Vicedomini notified the prosecution that he would not be able to attend the film festival in person due to work commitments in Italy, and he did not know when he would be in Los Angeles again.  The defense declined to stipulate to a conditional examination conducted by video conference.

On September 12, 2022, which was approximately one and a half months before trial began in this case, the prosecution filed a motion for a conditional examination of Vicedomini by video conference.  The prosecution attached to the motion email correspondence with Vicedomini about scheduling the examination.  The correspondence indicates that between February and July 2022, the prosecutor attempted to secure Vicedomini's attendance at an in person conditional examination in Los Angeles, but Vicedomini stated he could not travel there due to his work commitments.  In August 2022, Vicedomini informed the prosecutor that in addition to the work commitments, he could not travel to Los Angeles because he was going to have surgery on his head in October 2022.  The prosecutor requested that Vicedomini provide documentation from a medical provider regarding the nature of the surgery and his inability to travel.  Vicedomini responded that he had scheduled an appointment with his doctor "to make a final check-up on [his] health," and he would provide the requested documentation thereafter.

On September 10, 2022, Vicedomini sent an email to the prosecutor, stating, "Following up on my previous correspondence, I confirm that I am unable to travel to America anytime soon because in addition to the already announced surgery on my head, there is a new and more worrisome problem with my legs for which the medical specialist categorically advises against long trips at high altitude since he cannot possibly manage any negative consequences on my health." Vicedomini attached to the email a report from his doctor with attached imaging, dated September 8, 2022, stating in pertinent part: "The [ultrasound] study of the shallow and deep venous axis of the lower limbs shows signs of thrombophlebitis in the internal geminal veins of the left leg with thickened and poorly compressible walls. Signs of insufficiency of the left greater saphenous vein with presence of a few ectatic perforating branches of the thigh and leg (4 mm max)." The doctor prescribed a course of treatment for the condition, including medication, and noted, "Adequate hydration is recommended and prolonged flights are not recommended."

At the hearing on the motion, the defense raised no objection to an in person conditional examination but objected to it being conducted by videoconference. Defense counsel asserted Vicedomini was being "recalcitrant" about attending the examination in person and did not "me[e]t the medical threshold" for a video examination. Counsel further argued that a video examination would infringe on Weinstein's rights to confront and cross-examine Vicedomini during the conditional examination.

After considering the parties' arguments, the court denied the prosecution's motion for a video conditional examination of another prospective trial witness who lived in Italy and stated

she could not travel to Los Angeles for medical reasons but did not provide supporting documentation from a medical provider. The court granted the motion for a video conditional examination of Vicedomini, stating:

"With respect to Mr. Vicedomini I think it's a bit different. I think that there is evidence of a medical condition that makes air travel, especially prolonged air travel, dangerous.  And I'm going to allow it as to him and I'm going to allow it because initially the defense was willing to do a conditional examination for Mr. Vicedomini.  Initially there was an assertion he was an important witness for both sides.  I know it's changed.  So there was I thought an agreement that he could be subjected to a conditional examination when he was going to be in Los Angeles.

"That didn't happen and now it looks like it's not going to happen because, in part at least, of his medical condition.  So I'm going to allow it.  I'm going to allow it.  [*Sic*.]  Whether it gets used at trial is a different issue but I'm going to allow the examination to take place and I expect the People to set up whatever technology needs to be set up to effect that."

At the outset of the conditional examination, the court stated for the record that it was being conducted via "the Zoom platform because Mr. Vicedomini is in Italy."  The court further explained, "[T]he proceedings are being captured by a videographer for potential use in the future for the jury should that become necessary."  Before beginning the direct examination, the prosecutor asked the court:

"[The prosecutor]:  Your Honor, before I begin, may I just ask that a record be made that we can see his [Vicedomini's] face in court and that he takes up the large screen in court and may I

63

ask that the defendant's camera be put on so that for purposes of the 6th Amendment the witness can see him.

"The court: Yes.

"[The prosecutor]: Can we get Mr. Weinstein spotlighted in that camera?

"The court: Okay. All right. Mr. Weinstein is now visible on the camera."

Defense counsel did not raise an objection to this set-up or claim that Vicedomini and Weinstein could not see and hear one another while Vicedomini testified.

After establishing that Vicedomini was participating in the examination from Rome, Italy, the prosecutor asked him: "Now, even for witnesses who live internationally we are accustomed to them coming here to testify in person. Is there a particular reason why you're not able to travel?" Defense counsel objected based on relevance, and the court sustained the objection. Vicedomini did not testify on this subject.

After the testimony concluded, the parties and the court discussed matters relevant to presentation of the conditional examination at trial:

"[The prosecutor]: I don't know this needs to be on the record, but I just have a question about how we're going to present that conditional exam testimony. Are we -- should we redact out the objections?

"The court: I think it should be redacted out. If it was sustained and stuff was stricken I think it should be redacted out.

"[The prosecutor]: Okay.

"The court: If you have the ability to do that. I don't know if you do.

"[The prosecutor]: I don't know what format the video is going to come in but I'll talk to her.

"The court: Unless you have an objection to that, [defense counsel].

"[Defense counsel]: No. No. I don't. That's the normal process."

The defense did not raise an objection to the prosecution's use of the conditional examination at trial, either at the examination itself or when the prosecution introduced it at trial.

### 2. *Applicable law*

Under Penal Code section 1336, subdivision (a), a party may apply for an order permitting a conditional examination of a material witness when the witness "is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older, or a dependent adult." Although Vicedomini was under 65 years of age, and had not yet raised a medical issue, the defense agreed to his in person conditional examination, and so informed the court. The issue before us is whether the trial court erred in allowing the conditional examination to proceed by videoconference.

Penal Code section 1340, subdivision (a) provides, "The defendant has the right to be present in person and with counsel at the examination, and if the defendant is in custody, the officer in whose custody he or she is, must be informed of the time and place of the examination, and must take the defendant thereto, and keep him or her in the presence and hearing of the witness during the examination." However, "If the court determines that the witness to be examined is so sick or infirm as to be unable to participate in the examination in person, the court may allow the

65

examination to be conducted by a contemporaneous, two-way video conference system, in which the parties and the witness can see and hear each other via electronic communication." (*Id.*, subd. (b).)

We review a trial court's order granting a conditional examination for abuse of discretion. (*People v. Jurado* (2006) 38 Cal.4th 72, 114; *People v. Mays* (2009) 174 Cal.App.4th 156, 172.)

Whether conditional examination testimony may be admitted at trial is a separate question. The Sixth Amendment's "Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact. (*Coy v. Iowa* (1988) 487 U.S. 1012, 1016.) Notwithstanding that, admission of out-of-court testimonial statements does not violate the Sixth Amendment if two requirements are met: "unavailability and a prior opportunity for cross-examination." (*Crawford v. Washington* (2004) 541 U.S. 36, 68.)

Likewise, under state law, a video recording of a conditional examination "may be shown by either party at the trial if the court finds that the witness is unavailable as a witness within the meaning of [s]ection 240 of the Evidence Code." (Pen. Code, § 1345.) One of the grounds for finding a witness unavailable listed in section 240 is that the witness is "unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity." (Evid. Code, § 240, subd. (a)(3).) For a finding of such unavailability, " 'the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness's attendance, or his testifying, relatively impossible and not merely inconvenient.' " (*People v. Winslow* (2004) 123 Cal.App.4th 464, 471, italics omitted.) "[T]he phrase 'relatively impossible' to testify does not mean it is

66

impossible to elicit the testimony due to insanity or coma or other total inability to communicate.  Rather, the phrase includes the relative impossibility of eliciting testimony without risk of inflicting substantial trauma on the witness." (*Id*. at pp. 471-472.)

Under constitutional and state law requirements, "[T]he prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sanchez* (2016) 63 Cal.4th 411, 440.)

### 3.   *Analysis*

The trial court did not abuse its discretion in allowing the conditional examination to proceed by videoconference. Vicedomini provided a report from his doctor with imaging attached, showing he had a medical condition (leg vein issues, including thrombophlebitis) for which he was undergoing treatment.  Due to this medical condition, the doctor recommended that he refrain from taking long flights.  This evidence supports the trial court's finding that prolonged air travel—such as a flight from Italy to Los Angeles and a return flight from Los Angeles to Italy—would be dangerous for Vicedomini, and therefore he was unable to participate in the conditional examination in person due to his infirmity. Weinstein's opinion that "Vicedomoni's claims of health issues were pretextual" and "dubious" is not sufficient cause for us to disturb the court's finding, which is supported by substantial evidence.

Weinstein contends the court erred in admitting the conditional examination testimony at trial, arguing the

67

"prosecution failed to show a 'good faith' effort to obtain Vicedomini's testimony as is required for an unavailability finding." This contention is forfeited because Weinstein never objected or asked the court to make a ruling on this issue. (See *People v. Williams* (2008) 43 Cal.4th 584, 620, 625 [the defendant's claim that "the prosecution failed to establish that it had employed reasonable diligence to procure [a witness]'s presence at trial within the meaning of Evidence Code section 240, subdivision (a)(5)" was "not raised in the trial court and is forfeited"].)

When the court ruled that the conditional examination could proceed by videoconference," the court stated, "Whether it gets used at trial is a different issue but I'm going to allow the examination to take place . . . ." Thus, the court made clear that it was *not* deciding at that juncture whether the requirements for admission of the conditional examination testimony at trial had been met. Similarly, at the outset of the conditional examination, the court stated for the record, "[T]he proceedings are being captured by a videographer for potential use in the future should that become necessary," again making clear that it had not ruled on Vicedomini's unavailability for trial.

Defense counsel's conduct at the conditional examination indicated that the defense did *not* object to the admission of the testimony at trial. For example, when the prosecutor commented that Vicedomini was not testifying in person and asked him, "Is there a particular reason why you're not able to travel"—attempting to elicit information that would be critical to a finding of unavailability for trial—defense counsel objected based on relevance, and the court sustained the objection. At the conclusion of the conditional examination, when the parties and

the court discussed the format by which the testimony would be presented at trial, defense counsel stated the defense had no objection to the prosecutor's proposal and gave no indication that the defense objected to admission of the testimony at trial.

Further, the defense never asked the court to make a ruling on Vicedomini's unavailability for trial and did not object when the prosecutor offered the testimony during trial.

Where the defense did not ask the trial court to make a ruling on Vicedomini's unavailability for trial or object to admission of the testimony on this ground, engaged in conduct indicating acquiescence, and prevented the prosecution from eliciting testimony regarding Vicedomini's unavailability, Weinstein will not now be heard to complain.

Weinstein also contends the admission of the conditional examination testimony at trial "violate[d his] Sixth Amendment guarantee since [he] was never afforded a face-to-face confrontation with Vicedomini" because the examination was conducted by videoconference rather than in person. He cites case law indicating that an objection on this ground in opposition to an application for a conditional examination may preserve this contention on appeal. (See *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1525 (*McCoy*).) Assuming the claim was preserved because defense counsel objected on this ground at the hearing on the motion for Vicedomini's conditional examination, the claim nonetheless lacks merit. Weinstein cites no case law suggesting that admission of conditional examination testimony violates the confrontation clause where the examination was conducted by videoconference technology allowing the witness and the defendant to see and hear each other while the witness testified, rather than in person. The cases he cites are

69

inapposite. (See, e.g., *Coy v. Iowa, supra*, 487 U.S. at pp. 1014-1015, 1020, 1022 [the defendant's confrontation right was violated because a screen was placed between the defendant and two complaining witnesses so they could not see him during their testimony].)

During the conditional examination, the prosecutor and the court stated for the record that Vicedomini and Weinstein had their cameras turned on so that they would be visible to one another. Defense counsel did not raise an objection to the set-up or claim that Vicedomini and Weinstein could not see and hear one another while Vicedomini testified. Thus, any claim regarding the video and camera set-up is forfeited. (*McCoy, supra*, 215 Cal.App.4th at pp. 1526, 1527 [the defendant's failure to object at the conditional examination that "the video conference system did not allow for a face-to-face confrontation" or violated Penal Code section 1340, subdivision (b), at a time when "the magistrate could have ruled on whether to turn the camera during [the witness]'s testimony to allow her to see defendant," forfeited the contention on appeal].) In any event, there is nothing in the record indicating the set-up violated constitutional standards or Penal Code section 1340, subdivision (b).

Weinstein has not demonstrated that his right to a face-to-face confrontation was violated.

## F.   The Trial Court Did Not Abuse its Discretion in Admitting Testimony From De Lara

As discussed in the background section of this opinion, De Lara was the Mr. C Hotel guest who occupied the room directly below JD1's at the time of the charged offenses involving JD1. Weinstein contends admission of De Lara's testimony was error

70

and denied him a fair trial because it was irrelevant and led to "untrustworthy, speculative inferences" that "the prosecution demanded that the jury make."

"'The trial court is vested with wide discretion in determining the relevance of evidence,' although a court 'has no discretion to admit irrelevant evidence.'" (*Alexander*, *supra*, 49 Cal.4th at p. 904, quoting *Babbitt*, *supra*, 45 Cal.3d at p. 681.) Evidence that "leads only to speculative inferences" is irrelevant. (*Morrison*, *supra*, 34 Cal.4th at p. 711.) Admissibility requires that, "Inferences drawn from the evidence must be logical and reasonable, not merely speculative." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)

We review a trial court's decision excluding evidence for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) "To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 390, 405, 409, 423.)

### 1. *Relevant proceedings and testimony*

At a hearing regarding De Lara's prospective testimony, defense counsel urged the court to exclude it, asserting it would be irrelevant. Counsel told the court that when De Lara gave a statement, she said she heard a noise "'down the hall, not upstairs,'" and she was "not specific what day she actually heard it." The prosecutor represented that De Lara said in her

71

statement that she heard an argument "either in the hallway or above her" at some, unspecified point during her stay.  The prosecutor added, "And the court will recall that the allegations from [JD1] is [*sic*] that Mr. Weinstein showed up at her door and was making noise in the hallway which would have been above and in the hallway which is what Ms. De Lara essentially describes."  Defense counsel argued there were indications in De Lara's statement that she heard the noise at the beginning of her stay (Feb. 15, 2013) rather than on the date JD1 said the offenses occurred (Feb. 18, 2013), and there was nothing indicating the noise was connected to Weinstein.

The court stated, "[P]art of the problem is it's speculation as to what her ultimate testimony is going to be.  There seems to be a difference of opinion as to what her statement is and if the People establish that it happened at the relevant point in time or likely happened at the relevant point in time I think it's admissible."  The court further stated, "If it turns out that the People's offer of proof is incorrect, so be it, but I am entitled to accept their offer of proof."

At trial, De Lara testified on direct examination that she stayed at the Mr. C Hotel, in room 701, from February 15-19, 2013, on a business trip.  At some point during her stay, she was "woken up in the middle of the night by what sounded like an argument" between at least two people, occurring "either above [her] or on the same floor as [her]."  She recalled it being "a verbal argument," in that she "heard elevated voices," but she could not recall whether it involved men, women, or both, and she did not hear what they were saying.  She looked out into the hallway to try to determine where the voices were coming from, but she did not locate the source.

72

During cross-examination, after looking at a transcript of a statement she gave to the prosecutor in October 2020 (around two years before trial), De Lara confirmed that when the prosecutor asked her where she believed the noises were coming from, she responded, " 'I don't know. I remember like hearing yelling. Whether it was coming from down -- it sounded like more it was coming from down the hall, from what I remember, versus upstairs.' " She also confirmed that she told the prosecutor during her statement that she did not know which day during her stay she heard the noises. She testified on cross-examination, "For some reason though it feels to me like it was on the earlier side of my stay because I don't think my third colleague had arrived yet. I think it was just the two of us that had arrived. But I can't say for certain which day it happened." In response to a question by defense counsel, she affirmed that the "earlier part of [her] stay would have been the 15th or 16th when she first got there [to the Mr. C Hotel]." On redirect examination, she testified that when she gave her statement to the prosecutor in October 2020, she was not certain that the noises were coming from down the hall as opposed to upstairs.

During argument, when the prosecutor was discussing JD1's testimony that Weinstein banged on her hotel room door and yelled for her to open it, the prosecutor stated: "And if you recall Alexandra De Lara was also a guest of Mr. C's. And Alexandra De Lara told us that she heard a noise. She heard yelling. She thought it was coming from either the hallway or from upstairs; so she actually went out into the hallway to see if she could see something." Defense counsel did not object to this argument.

73

During Weinstein's closing argument, defense counsel stated, "And what of the witness that the prosecution called to suggest that she heard the assault as it was happening, this person by the name of De Lara -- I believe it's Alexandra De Lara?  Supposedly, the prosecution called her to describe hearing the actual assault, as it was happening.  That is not -- that's not just troubling, that's insulting.  That's insulting.  And for them to bring it up in closing argument, and double-down on it, is even more insulting."  After providing the defense view as to the specifics of her testimony, defense counsel stated, "They [the prosecution] know full well that that noise complaint was a red herring, has nothing to do with this case whatsoever, can't say it was on the same day, and it was down the hall on the 7th floor."

### 2. *Analysis*

As addressed previously, a court has broad discretion to admit evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (§ 210; *Alexander, supra*, 49 Cal.4th at p. 904.)  Based on its offer of proof, the prosecution offered De Lara's testimony as tending to show she heard elevated voices at the door of JD1's hotel room (directly above De Lara's room) on the night in question.  As the court indicated, it was impossible to know what De Lara's ultimate testimony would be.  But given De Lara's previous statement about the incident, her proximity to JD1's room, and the overlap in their stays at the Mr. C Hotel, the court did not err in overruling the relevance objection and allowing her to testify.

De Lara testified consistently with the prosecution's offer of proof.  She stated that during her stay, she was awakened in the middle of the night by an argument (elevated voices) emanating

74

either from above or down the hall from her room. She looked out into the hallway but did not locate the source of the noise. She was unsure which night she heard the argument, and could not rule out that it had occurred on the night of February 17-18, 2013. On cross-examination, the defense elicited testimony indicating the argument may have occurred before the night in question (possibly February 15 or 16), and it may have taken place down the hall from her room. The defense did not ask the court to strike the testimony or object to the prosecutor's argument about it. Instead, defense counsel argued to the jury that the prosecution's reliance on this testimony was "insulting" because it was irrelevant, having "nothing to do with this case whatsoever."

The trial court did not exceed the bounds of reason or exercise its discretion in an arbitrary, capricious, or absurd manner when it allowed De Lara to testify. Weinstein's challenge to this testimony goes to its weight, not its admissibility. It was for the jury to determine the credibility of the testimony and the weight to assign it.

## G. The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Weinstein's Uncharged Sexual Offenses.

Under section 1108, subdivision (a), "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Under section 352, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Weinstein contends the trial court's admission of evidence of uncharged sexual offenses "stripped" him of the presumption of innocence, denied him a fair trial, and constituted an abuse of discretion.

### 1. *Relevant proceedings and testimony*

Prior to trial, the prosecution filed a motion under sections 1108 and 1101, subdivision (b), seeking to introduce "evidence of [Weinstein]'s misconduct involving 16 women: the sexual assaults of 13 women, the attempted sexual assault of one additional woman and the mistreatment of two more women." The prosecution stated that the evidence could be categorized into four scenarios that Weinstein employed when he sexually assaulted his victims or engaged in sexual misconduct. As stated in the respondent's brief, these four scenarios are: "(1) [Weinstein] unexpectedly appeared at the victim's apartment or hotel room and sexually assaulted, or attempted to sexually assault, the victim when she allowed him entry; (2) [Weinstein] trapped the victim in a bathroom and sexually assaulted her; (3) [Weinstein] trapped the victim in a bedroom and sexually assaulted her; and (4) [Weinstein] engaged in sexually aggressive behavior toward employees."

Weinstein filed an opposition, arguing, among other things, that by bringing "disparate complaining witnesses together in one case, the government's various complaining witnesses constitute the type of propensity evidence contemplated by Evidence Code section 1108. Thus, additional 1108 witnesses are wholly unnecessary." He further argued that at minimum, the prosecution's proposed evidence "must be limited."

76

At the hearing on the motion, after hearing argument from the parties, the court stated:

"I'm taking it as a good faith request [by the prosecution] for those witnesses, but I'm not going to allow all of them. I think there are too many and I think that the number of them is going to confuse the issues that the jury is going to be here to decide and that is the ultimate question.

"I think a general appropriate cutoff for relevance and not being too remote is, as I indicated, things that occurred in the two thousands.

"The only exception to that I think that has some merit has to do with Kelly S. which has an event that occurs before 2000 but is relevant also to an event that occurred after 2000."

With respect to the four "scenarios" presented by the prosecution, as enumerated above, the court ruled that as to the first scenario, it would allow testimony from one witness, Natassia M. As to the second scenario, the court allowed testimony from Kelly S. and two other witnesses to be chosen by the prosecution (out of seven witnesses who fell within the parameters of the second scenario and the court's ruling on remoteness). Regarding scenario three, the court allowed testimony from Kelly S. and Ms. I. and documentary evidence regarding Miriam H. (Weinstein's New York conviction). The court deferred a ruling on the witnesses related to the fourth scenario.

As to the permitted witnesses, the court explained: "They are relevant because they are alleged to have occurred and under [section] 1108 they are made relevant. But I have to do a [section] 352 analysis. My 352 analysis is not too remote, having some similarity to the scenarios involved in the charged offenses,

77

which I think all of these do, and not so many of them that we lose sight of the ultimate issue the jury is going to be called upon to try."

The court further stated: "I believe right now based upon the offer of proof from the People that in addition to being admissible under [section] 1108 the ones I designated are admissible under [section] 1101(b) if in fact lack of consent becomes an issue, which I know the People have to prove in their case in chief. I believe these incidents, if they come out the way the offer of proof is, would be relevant to show lack of consent and knowledge of lack of consent. I think they are relevant on a common plan theory. I don't think they are relevant on a modus operandi theory. So that's my analysis of it."

Although the court ruled that the prosecution could call a total of six witnesses to testify about uncharged sexual conduct, the prosecution called only four.

### a. *Ashley M.*

In 2003, Ashley M. was cast as a dancer in Miramax's "Dirty Dancing: Havana Nights." She traveled to Puerto Rico where the movie was being filmed.

She met Weinstein for the first time on the movie set. One day during filming, he walked up to her and suggested they go outside and talk. After they sat and began talking, she felt scared and nervous because she did not know what was going to happen. He told her she was pretty. Then, he told her he wanted to do "a naked massage" with her. She declined, explaining that she was engaged. He asked who her fiancé was, and when she told him, he said he knew him. Weinstein told her not to worry about the massage because it would just be a friendly thing. He

78

explained he had done it with Gwyneth Paltrow, and it advanced her career, so Ashley should think about doing it.

She became worried and tried to think of another excuse to get out of the situation. Again she declined the massage, telling him she was supposed to be on set. He responded aggressively, " 'I'm the one in charge here. They all answer to me.' " It scared her. She was relieved when a meal break was called on set. But Weinstein told her he would be waiting to take her to a hotel when the break was over.

Ashley called her mother and her fiancé because she was afraid and did not know what to do. They both advised her to speak with the producer or choreographer. She did, but neither helped. She was "[f]reaked out."

The break ended, and Ashley went back to the set. Weinstein and his assistant Bonnie were waiting near a limousine. Ashley felt better knowing she would not be alone with him. He instructed her aggressively and repetitively, " 'Walk to Bonnie and get in the car. Walk to Bonnie and get in the car.' " Ashley looked to Bonnie for help, and Bonnie said, " 'Don't worry. I'll be with you the entire time. He just wants to talk about future projects.' " This made Ashley feel more at ease, and she got in the car. After a short drive they arrived at a hotel.

Weinstein went to the front desk and spoke to a member of the staff. Ashley felt worried because she did not know what was going on, but having Bonnie there made her feel better. A few minutes later, they walked to an elevator, went upstairs, and walked down a long hallway. When they stopped at the door to a room, Ashley felt more worried. Weinstein entered the room and Ashley followed. Bonnie shut the door behind them and remained in the hallway.

As soon as they entered the room, Weinstein became physically aggressive with Ashley.  She did not know what to do because he was so much bigger than her.  He shoved her onto the bed, removed her shirt and bra, and took off his shirt and pants.  He climbed on top of her, straddling her body.  She was crying hysterically, telling him to stop, and trying to move.  He fondled her breasts and began masturbating.  He told her, " 'It's okay.  It's not like we're having sex.' "  He ejaculated on her breasts and face.

Ashley cleaned herself and got dressed quickly.  She just wanted to leave.  She had been afraid Weinstein was going to rape her, and she felt thankful he had not.  After he got dressed, they left the room.  As Ashley walked out, she saw Bonnie standing in front of the door holding a clipboard.  Ashley was crying hysterically.  They walked back to the limousine and drove back to the set.

As soon as she got back, Ashley called her mother and fiancé and told them Weinstein masturbated in front of her, without disclosing the other details.  She was still hysterical.  She did not tell anyone on the set what happened because she felt like they were all worried about their careers.

Ashley did not wind up being in the movie because her scene was filmed while she was at the hotel.  She traveled home the next day.  At some point later, she received a voicemail message from Weinstein or Bonnie, offering her a part in a movie.  She did not take the part and never worked on another one of his films.

### b. *Kelly S.*

In 1991, Kelly S., a 24-year-old actress, met Weinstein at a party during the Toronto International Film Festival.  They had

80

a nice conversation about books, films, and her career.  When the party ended in the late afternoon, he asked her to go get a drink and she agreed.  They walked to a nearby patio, had a few glasses of wine, and talked about films for about an hour.  He mentioned an Irish film and told her there was an acting role in it that would suit her.  He invited her to his hotel to see it.  She was ambitious and thought it was a good opportunity, and she wanted to see the script.

They walked to his hotel and went up to his room.  Kelly thought they would grab the script and go back downstairs to read it.  Weinstein went into the bathroom, and she sat on the corner of the bed.  When he came out, he was wearing an unbuttoned shirt and was otherwise naked.  He was holding a hot facecloth.  She was shocked.  He walked toward her quickly, aggressively, and purposefully.  He told her, " 'You're gonna love this,' " and " 'It's okay.  It won't take long.' "

He pulled off her skirt.  She was not wearing underwear.  He placed the hot cloth on her vagina and said, " 'My wife loves this.  You'll love it.' "  She responded, " 'No.  Stop it.  What are you doing?' "  He began licking her vagina.  She froze and felt "[n]auseous, scared, terrified."  He had one hand on her chest, and his arms were across her legs.  Then, he inserted his fingers into her vagina.

She became hysterical and said, " 'Please let me out of here.  Stop.  Stop this.  I have to go."  He responded, " 'I'm going to fuck you.  It won't take long.' "  He put his penis inside her vagina.  He was on top of her.  She panicked and was able to get out from under him.  She grabbed her things and asked him why he did this to her.  He responded, " 'Everything is okay.' "  She left and went to a friend's house.  She told her friend what happened.

Weinstein called Kelly at her home several times. She asked him why he raped her, and he said that was not what happened. He said he really liked her and would leave his wife for her. He also told her that she should go to New York and meet with a woman who did casting for his company.

Kelly did go to New York, and she brought a friend so she would not be alone. Weinstein paid for her trip. She and her friend were supposed to meet him for dinner but he did not show up. The next morning, he called her hotel room. He told her to "get rid of" her friend and said he was coming up to her room. His tone was aggressive and demanding, and she was scared. When she said no, he became very angry and started yelling. Every time she hung up the phone he called back. The employees working at the front desk did not know what to do because he was making a scene. Kelly went out into the hallway and heard him screaming in the lobby and out on the street. Eventually, he left. She did not go to an audition or meet with Weinstein in New York. She had no further phone calls with him. She stopped pursuing a career as an actress because she did not want "to go through anything like that again."

In 2008, Kelly ran into Weinstein in the lobby of the Four Seasons Hotel in Toronto. He walked by her, and she blurted out his name because she was shocked to see him. He went over to her, said hello, and left. Her "blood kind of stopped," and she became angry. Later, when she was having wine with a friend, Weinstein's assistant, Victoria, approached her and said he wanted to see her. She agreed because she wanted to confront him about what happened in 1991. Victoria took her upstairs to Weinstein's suite. Kelly and Weinstein made small talk and then

Kelly "blurted out[,] 'How does it feel to be in front of the one woman that said no to you?' "

Weinstein asked Victoria to wait in the hallway. He moved Kelly away from the door because she was being loud, saying all the things she had wanted to say to him for nearly 20 years. His arm was across her shoulder, and he was speaking in a soft tone as he moved her. Next thing she knew, they were in a bathroom. He closed the door and stood in front of it. She felt stupid, angry, and afraid. His demeanor changed, and he began propositioning her for sex. She said no and told him she had to leave.

Weinstein pulled her shirt, attempting to see her breasts, and he pulled down her skirt. He asked her to show him her breasts and vagina. He pulled out his penis and began masturbating. He grabbed her breast. She told him to stop and said she had to leave. He continued telling her to show him her breasts. She did not try to leave because there was no way she could get around him because he was much bigger than her. After five to 10 minutes, he ejaculated on the bathmat. He fixed his pants and opened the bathroom door. They walked out. Kelly opened the door to the suite. Victoria was standing outside, and Weinstein asked her to invite Kelly to some parties and do something for her son. Victoria took Kelly back downstairs.

Eventually, Kelly told a few friends about what happened with Weinstein. She did not report the 1991 or 2008 incident to the police. She was afraid, embarrassed, and ashamed, and she felt stupid.

### c. *Ambra B.*

In March 2015, Ambra B. was working as a model in New York. She was from Italy and did not speak much English then. On March 26, 2015, she went to a party with her agent and some

other models.  She noticed Weinstein looking at her, but she did not know who he was.  He walked over and asked her name and the name of her agency.  Her agent spoke to him for a few minutes.  He told Ambra she looked like the actress Mila Kunis.  They exchanged business cards, and he left.

The next day, Ambra's agent told her Weinstein wanted to see her for a casting opportunity at the Tribeca Film Center.  She went, and Weinstein said he was happy to see her.  Again, he told her she looked like Mila Kunis.  Ambra showed him her digital portfolio on her iPad, which included photos in bikinis and lingerie.  He asked if her breasts were real.  She hesitated before answering because it was a strange question that she was not typically asked.  Then she said yes.  Weinstein asked if she was sure and grabbed her breast over her clothing.

Ambra was shocked.  But she did not react until Weinstein put his hand on her upper thigh and told her to kiss him.  She said no and leaned back.  He apologized and moved away from her.  He left the room, and an assistant came in.  Ambra did not feel safe and wanted to leave.  She went to the bathroom.  She was shaking.

Ambra left and went to her agency.  She was crying and told one of the agents what happened.  She said she wanted to go to the police, but the agent was against it.  Nonetheless he and his fiancé went to the police station with her.  She was scared, tired, and overwhelmed.  She was sent to a different station where she went to make her report.  At the second station, officers set up a pretext call between her and Weinstein.  During the call, she agreed to go to a show with him the next day.

Before the show, she went to the police station and obtained an audio recording device.  After the show, Weinstein

came over to her and said that his driver would take her to the bar at Tribeca Grand. She remained in contact with the police and texted a sergeant so they knew where she was going. When she arrived, she went to a restaurant bar in the lobby and waited. She felt safe because she saw that police officers she had met with were there in plain clothes. Weinstein joined her at her table, and they talked about acting. Suddenly, he said he needed to go to his hotel room, and he asked her to go with him. When she asked why, he said he needed to get ready for an event.

Ambra followed him, and they took the elevator to the second floor. She told him she left her jacket downstairs, which she had done on purpose because she did not want to go to his room. He followed her downstairs to get the jacket, and then they went back up to the second floor. An undercover police officer followed them and pretended to be a reporter from TMZ. The officer asked Weinstein questions to stop him from trying to take Ambra into a hotel room.

Weinstein and Ambra went back down to the lobby, and Weinstein spoke with someone at the front desk. Then, he led Ambra outside and to a service entrance. Another man was there, who might have been with hotel security. They took the service elevator to the 8th floor penthouse. When they were in the hallway, Ambra told Weinstein she did not want to go inside the room. He kept insisting and began screaming at her that he was famous and everyone knew him, and it would embarrass him if she did not go in the room. She kept repeating that she wanted to go. Eventually, he told her to leave and not to contact him again.

Ambra walked to the elevator, and Weinstein followed her. They went downstairs, and he insisted she have a drink. The

police had told her to go into the bathroom if she felt uncomfortable, so she did.  An officer was waiting inside the bathroom and told her everything was done.  She left and went home.

### d.    *Natassia M.*

Natassia M. first encountered Weinstein in 2002, after she moved to New York for a modeling campaign.  She was at a restaurant with the person who had hired her for the campaign and a "famous model."  She testified:  "I didn't know who he [Weinstein] was but he was sitting on a chair at this restaurant staring at me, gazing at me for a very long time with his legs open and hunched over and he would not break his gaze so I started yelling in the restaurant."  She yelled, " 'Who the fuck is that fat fuck who is sliming me.' "  The model whispered to her that it was Weinstein and indicated that she should be quiet.  Natassia yelled, " 'I don't give a fuck who it is.  That guy is sliming me.' "

In 2007, Natassia M. booked a large modeling campaign that required her to travel to 27 countries.  During fashion week in New York, she took photographs with several celebrities.  Her publicists told her to take a photo with Weinstein.  When she was introduced to him, he said, " 'Where are you staying?  What's your room number?' "  She was flabbergasted and did not know how to respond.  She told him the name of her hotel, they took a photo, and the interaction ended.

Natassia next saw Weinstein in London in 2008.  She was at a BAFTA Awards afterparty, when she ran into a glass wall.  Her publicists made her an ice pack and told her to take some photos with Weinstein while she was holding the ice pack so they could create a story about it.  So, she did, and she also took

86

photos with other celebrities.  After the party, she went back to her hotel and went to bed.

She woke up to Weinstein banging on her hotel room door, loudly yelling her name, and loudly saying his own name.  She was embarrassed and concerned that her publicists would hear him.  She opened the door and noticed that his shirt and pants were rumpled and he did not look neat.  He stormed into the room and said, " 'You know no one gets to be an A-lister unless it goes through me.' "  Natassia was very scared of Weinstein because he was "the most powerful person in Hollywood," who "could make you or break you."  She did not know what to do in this situation, so she "completely froze."  She did not know how he found her room.

She backed away from him and sat on the bed.  He took off his pants, pushed her down on the bed, and climbed on top of her.  She said, " 'I don't do the casting couch thing.' "  She turned her head away from him and looked into the blanket on the bed.  He inserted his penis into her vagina.  She played dead and did not respond at all.  He was much bigger than her, he was intimidating, and she knew he had the power to ruin her career if she tried to fight him.  He climbed off her, stood next to the bed, masturbated, and ejaculated into his hand.  He washed his hands in the bathroom, said something about a movie, and then left.  The following day there was a script on the bedside table for the movie Weinstein had mentioned to her.

She did not call the police because she did not like to share private things about herself.  She did tell her best friend and a director, however.  She had no further contact with Weinstein in London.

Natassia went to Los Angeles because she wanted to get a part in the movie Weinstein had mentioned. She took singing and dancing lessons to prepare for the part because it was a musical. After meeting with the director, she had a dance audition. To her surprise, Weinstein was at the audition. She was horrified and could not concentrate. She did not see him again on that trip.

She still wanted the part in the movie, so she continued her vocal training. She recorded her voice and sent an email to Weinstein and his staff telling them that she was going to send them a DVD. Weinstein responded, telling her to send the DVD to his assistant. He also mentioned having a "threesome" with her, and she told him she was not interested. He then told her to drop off the DVD with his assistant in the lobby of the Peninsula Hotel.

When she arrived in the lobby, she tried to give the DVD to his assistant, but the assistant would not take it, explaining that Weinstein wanted to speak with her about the movie. She followed the assistant to a room and they walked in together. Natassia handed the DVD to Weinstein. He chuckled and tossed it aside. She looked to his assistant for help getting out of there. Weinstein moved to a different part of the suite, and Natassia turned to look at him. When she turned back, the assistant was gone.

Weinstein called Natassia over to him, and she then noticed that there was another woman in the room who she believed was a prostitute. She was furious. They tried to get her to have a threesome with them. She really wanted the movie role, so she decided to play along but pretend that she was really

innocent and shy.  She put on a bathrobe and watched as the woman performed oral sex on Weinstein.

The next time Natassia saw Weinstein was at an Oscar's party in 2011.  She was there with her boyfriend.  Weinstein asked to speak to her, and they sat down together.  He told her he thought she was going to contact the tabloids.  She said she was never going to do that because he was powerful and could ruin her career.  He responded, " 'It pays to be my friend, Natassia.' " She took this to mean that he had discredited and blacklisted her in Hollywood, and she would have to pretend to be his friend so he would "fix any damage" he had done to her career.

Thereafter, Natassia saw Weinstein when she was in Santa Monica for a film festival.  She approached him to try to arrange a meeting for a producer she had just met.  Weinstein invited her to meet him at the Montage hotel for a drink and told her that his assistant would be there so she did not have to worry.  When Natassia arrived at the hotel, Weinstein's assistant approached her and said Weinstein wanted to meet with her in his suite.  She went to the suite, and he told her to have a glass of champagne.  She decided to confront him about his "problems" and asked whether he had ever considered speaking to a therapist.  He told her he had spoken to a therapist.  Then, he said he was in a hurry and wanted her to watch him take a shower.  She agreed because she wanted to pretend to be his friend and because she thought he understood he had a problem.

Natassia also saw Weinstein in New York in 2011.  An actor had invited her to see a theater production, and she invited her friend Dahlia to attend because Dahlia liked to meet celebrities.  Dahlia wanted to meet Weinstein, so Natassia arranged for them all to meet at an Italian restaurant.  When

they arrived at the restaurant, Weinstein told Dahlia that he wanted to show her his office, which was nearby. The two began walking and Natassia followed. When they arrived at the office, Weinstein told the few employees who were there to leave, and they did. Weinstein, Natassia, and Dahlia chatted inside his office. He told Natassia that she could not be an actress, but she should not worry because she could be a "host."

While Dahlia was smiling and speaking with Weinstein, he put his hands on her head and pushed it toward his groin area. Natassia asked him what he was doing to her friend. Dahlia looked at her and said, "Oh my god," or something like that. Weinstein grabbed Natassia's hand and pulled her into a dark room. He stood in front of the closed door, grabbed her breast, and began masturbating. After he ejaculated, he opened the door, said goodbye, and Natassia and Dahlia left.

### 2. Applicable law

Ordinarily, evidence of a defendant's prior bad acts is inadmissible to prove his propensity to commit the charged offense, but may be admitted where relevant to prove a fact "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented." (§ 1101, subds. (a)-(b).) As set forth above, however, section 1108 permits the admission of evidence of prior sexual offenses to show a defendant's propensity to commit a charged sexual offense, so long as the evidence of the uncharged offenses is not inadmissible under section 352 (i.e., "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time

90

or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury"). (§§ 352, 1108, subd. (a)(1).)

"The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) " ' "In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citations.]' [Citation.] " ' "Undue prejudice" refers not to evidence that proves guilt, but to evidence that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on an improper basis: "The prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." ' " ' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1276-1277.)

In deciding whether to admit evidence of a prior sexual offense under section 1108, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 917.)

"Like any ruling under section 352, the trial court's ruling admitting evidence under section 1108 is subject to review for abuse of discretion." (*People v. Story* (2009) 45 Cal.4th 1282, 1295.) "A trial court abuses its discretion when its ruling 'falls outside the bounds of reason.'" (*People v. Hollie, supra*, 180 Cal.App.4th at p. 1274.)

### 3. *Analysis*

Under section 1108, evidence of Weinstein's uncharged sexual offenses was relevant to show his propensity to commit the sexual offenses charged in this case. The only question is whether the trial court abused its discretion in concluding the probative value of the evidence was *not* "substantially outweighed by the probability that its admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) The court's decision to admit the evidence did not exceed the bounds of reason for the following reasons.

The court limited the uncharged offenses quantitatively and temporally. Out of the 16 witnesses originally proposed by the prosecution, only four testified at trial (two fewer than the court's ruling allowed). The court carefully considered the issue of remoteness, limiting the conduct to that which occurred in the year 2000 or later (except in one instance where a 1991 incident informed a later 2008 incident involving the same witness).

None of the uncharged conduct was more graphic or inflammatory than the charged conduct. And all of the uncharged conduct was probative as to JD1, given the breadth of the offenses Weinstein committed against her (sexual penetration by a foreign object, forcible oral copulation, and forcible rape),

92

and the other conduct he engaged in when he was with her (e.g., masturbation, trying to open her robe to access her breasts).

Weinstein's suggestion that the jury may have punished him for the uncharged offenses rather than the charged offenses rings hollow where the jury returned not guilty verdicts as to three of the four complaining witnesses in this case.

In short, Weinstein has not shown the trial court's decision to admit the evidence fell outside the bounds of reason.

## H. Weinstein Has Not Established Instructional Error

### 1. *CALCRIM No. 1191A*

Weinstein contends the trial court "misinstructed the jury in connection with its use of section 1108 evidence where the instruction [CALCRIM No. 1191A] failed to specify the enumerated 1108 offenses or [the] elements on which the jury was expected to deliberate."

#### a. *Relevant proceedings*

Weinstein filed written objections to the prosecution's proposed jury instructions. As to CALCRIM No. 1191A, he objected as follows, in full, with no elaboration: "The Prosecution's Proposed Instruction 1191A is incomplete and misstates the law."

Subsequently, during a conference on jury instructions, the parties and the trial court discussed this specific instruction. The prosecutor informed the court that he had modified the standard instruction to reflect that the uncharged offenses must be proved beyond a reasonable doubt rather than a preponderance of the evidence. Defense counsel agreed with that change. Later during the conference, defense counsel brought up CALCRIM No. 1191A again and reiterated that the defense would stipulate to

93

raise the burden of proof for the uncharged offenses.  Counsel added, "[O]therwise, no objection to that instruction."

When the trial court instructed the jury with CALCRIM No. 1191A, as follows, the defense raised no objection:

"The People presented evidence that the defendant committed sexual assaults that were not charged in this case. These crimes are defined for you in these instructions.

"You may consider this evidence only if the People have proved beyond a reasonable doubt that the defendant in fact committed the uncharged offenses.  If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit sexual offenses, as charged here.  If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of sexual offenses.  The People must still prove the charge beyond a reasonable doubt."

The trial court also instructed the jury on the elements of sexual battery by restraint (CALCRIM No. 935A & 935B), sexual battery (CALCRIM No. 938), forcible rape (CALCRIM No. 1000), forcible oral copulation (CALCRIM No. 1015), and sexual penetration by a foreign object (CALCRIM No. 1045).

**b.** *Applicable law and analysis*

" 'Generally, a party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too

94

general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012, italics added.) The Attorney General argues that by failing to object to the instruction in the trial court, Weinstein forfeited his contention that the court erred by not listing specific uncharged offenses and their elements in the version of CALCRIM No. 1191A given to the jury. Weinstein, however, contends that due to the omissions from the instruction that he asserts, "CALCRIM [No.] 1191A as given was *not* correct in law," and his contention therefore is not subject to forfeiture. Thus, despite the defense's express approval of the instruction given to the jury, we must nonetheless review Weinstein's claim on the merits and determine if the instruction was correct in law.

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210 (*Cole*).) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 (*Sanchez*).) " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' " (*Solomon*, at p. 822.)

In arguing that the instruction given to the jury was incorrect in law, Weinstein relies on the Bench Notes to CALCRIM No. 1191A, which state in pertinent part, "In the first sentence, the court must insert the name of the offense or

95

offenses allegedly shown by the evidence.  The court **must** also instruct the jury on elements of the offense or offenses." Weinstein asserts, "Without a proper instruction, the jurors were left with nothing but their own subjective and individual beliefs about what constituted a 'sexual assault' which necessarily precluded them from unanimously finding that Defendant committed an enumerated offense as is required under section 1108."  When we consider the instructions as a whole, as we must, it is readily apparent that Weinstein's assertion lacks merit.

The first two sentences of the instruction given to Weinstein's jury state, "The People presented evidence that the defendant committed *sexual assaults* that were not charged in this case.  *These crimes are defined for you in these instructions*." (CALCRIM No. 1191A, italics added.)  Elsewhere in the charge to the jury, the court instructed on the elements of sexual battery by restraint (CALCRIM No. 935A & 935B), sexual battery (CALCRIM No. 938), forcible rape (CALCRIM No. 1000), forcible oral copulation (CALCRIM No. 1015), and sexual penetration by a foreign object (CALCRIM No. 1045).  The third and fourth sentences of CALCRIM No. 1191A informed the jury, "You may consider this evidence only if the People have proved beyond a reasonable doubt that the defendant in fact committed the uncharged offenses.  If the People have not met this burden of proof, you must disregard this evidence entirely."  Thus, CALCRIM No. 1191A informed the jurors that they could consider evidence of an uncharged "sexual assault" if, and only if, they concluded the prosecution proved beyond a reasonable doubt that the evidence of that uncharged sexual assault satisfied the elements of one of the crimes on which they were instructed.  To

96

the extent the court should have listed the specific crimes in CALCRIM No. 1191A, the omission did not render the instruction incorrect in law.

Weinstein's reliance on *People v. Jandres* (2014) 226 Cal.App.4th 340 is misplaced. The case supports our conclusion that there was no error here. There, the version of CALCRIM No. 1191 given to the jury was erroneous in numerous respects, including that it listed the uncharged offense as attempted kidnapping, which is not a sexual offense within the meaning of section 1108. (*Id*. at pp. 351, 358.) "The evidence [of an uncharged sexual offense] was admissible only as a potential violation of Penal Code section 647.6 [annoying or molesting a child under 18 years of age], and yet the court made no mention of that provision," an error the People conceded on appeal. (*Id*. at p. 358.) Moreover, the court did not instruct the jury on the elements of a violation of Penal Code section 647.6, another error the People conceded on appeal. (*Ibid*.) Here, in contrast, the court instructed the jurors on the elements of five sexual offenses, and CALCRIM No. 1191A made clear that these were the offenses they could consider as uncharged sexual assaults if the elements were proven beyond a reasonable doubt. We conclude there is no reasonable likelihood the jurors used "their own subjective and individual beliefs about what constituted a 'sexual assault,'" as Weinstein asserts, where the charge to the jury was clear.

Weinstein further argues, without supporting authority, that "a [d]efendant is entitled to have a jury determine unanimously whether uncharged sex offenses occurred before that evidence can be used for *any* purpose." The suggestion that unanimity is required is incorrect. As our Supreme Court has

97

explained, with respect to evidence of uncharged sexual offenses "Jury unanimity has not been held to be a prerequisite to individual jurors considering this evidence." (*People v. McDaniel* (2021) 12 Cal.5th 97, 145, citing CALCRIM No. 1191A.)

Finally, Weinstein maintains, "A note written by the jury expressing confusion over the use of the evidence [of uncharged offenses] was understandable where the jury was denied the criteria by which to consider whether [Weinstein] committed a range of unidentified 'sexual assaults.' " The note in question states: "If we do not believe that the prosecution has proven the uncharged offenses against a named victim beyond a reasonable doubt, are we to disregard the testimony in its entirety? Or are we still allowed to use portions of their testimony to support reasonable doubt?" The court wrote back, "Please refer to instructions #375 and 1191A. If you still have a question, please let us know." This note expresses no confusion as to which sexual offenses constitute "sexual assaults" within the meaning of the instruction or the elements of the sexual offenses. Thus, the note is not germane to our analysis of whether there was instructional error.

For the foregoing reasons, we conclude the version of CALCRIM No. 1191A given to the jury was correct in law, and there is no reasonable likelihood the jury misunderstood the instruction in the way Weinstein asserts.

### 2. *CALCRIM No. 371*

Weinstein contends the trial court erred in instructing the jury on consciousness of guilt and suppression of evidence with CALCRIM No. 371. He asserts, "The instruction was unjustified where the record is devoid of any basis for giving the instruction." He further argues that "the prosecution engaged in serious

misconduct by using the instruction to suggest that [Weinstein] destroyed the Mr. C lost and found records, a baseless claim."

### a. *Relevant proceedings*

### 1. *Conference on jury instructions*

The prosecution asked the court to instruct the jury with CALCRIM No. 371. During a conference on jury instructions, the defense objected, arguing there was no evidence suggesting Weinstein had suppressed evidence. The prosecutor argued the instruction was warranted based on the missing lost-and-found records from the Mr. C Hotel and evidence that Weinstein threatened JD1 (and Jane Doe No. 3) not to tell anyone about the sexual offenses. After hearing additional argument from defense counsel, the court stated it would hold off on making a ruling and allow the defense to research the issue.

During a subsequent conference, the defense reasserted its objection to CALCRIM No. 371, again arguing there was no evidence to support it. The court stated it was "not sure that there [was] sufficient reason to give it," and asked the prosecutor for further argument. The prosecutor indicated that "the principal reason" the prosecution requested the instruction was because there was evidence that Weinstein threatened JD1 (and Jane Doe No. 3) not to tell anyone about the sexual offenses. The court recalled that it was expecting research on that issue (which it does not appear the court received, based on the record before us). The parties presented further argument on whether the instruction applied on that basis.

The prosecutor argued: "[T]he other use of that evidence that the defense refers to is the fact that there are, in fact, missing lost-and-found records from Mr. C's, and there's evidence that Mr. Weinstein personally reached out to the owner of Mr. C's

99

Hotel and asks specifically to speak to him about [JD1] in the days after she came forward with the allegations -- and it is circumstantial evidence; there is no doubt about that -- but it's a reasonable inference that he wanted Mr. Cipriani to take affirmative steps to help out his case." Defense counsel responded, "There is zero evidence that there was any sort of destruction or malfeasance on the part of Mr. Weinstein." Defense counsel also disputed that there was evidence showing Weinstein threatened Jane Doe No. 3.

The court stated that it would conduct its own research on the matter and notify the parties when it had a ruling.

During a conference the following day, the court informed the parties: "I'm going to give [CALCRIM No.] 371. I think there is enough evidence to give 371. I understand the defense is objecting to it. I think we've talked about it as much as there is to talk about. So I am going to give it." Defense counsel responded, "May I inquire -- not quarreling with the court. But can the court articulate the grounds for giving 371?" The court stated, "I think that the fact that there were statements about not telling anybody about what happened is sufficient to justify giving it."

The court instructed the jury with CALCRIM No. 371 as follows: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

100

## 2. *Relevant closing argument*

In opening argument, during a discussion about witness Ambra M., the prosecutor noted that when she went to Weinstein's office, she was "not asked to sign in to that guest or visitor sign-in log." The prosecutor argued: "It wouldn't seem that important; right? Except for the fact that it is a pattern of missing items when it comes to anything about Harvey Weinstein. [¶] With [JD1], it's the lost and found records for Mr. C's. Somehow those don't exist either."

Later in the argument, the prosecutor addressed the emails Weinstein sent to Cipriani, the owner of the management company that ran the Mr. C Hotel, about JD1. Immediately thereafter, the prosecutor stated:

"And since we're on the topic of Mr. C's, there's other questions. What about all the records? Where are those? So Guy Groves, the Head of Security at the time, he told us that he had records that went back 20 years. He sarcastically laughed when we informed him that Mr. C's said that they had had some computer glitch, a technical issue as to why they didn't have all the records. He laughed. And he said that if he didn't want to produce things, he would make up that excuse. He would say, 'Oh, there was a computer glitch. It was a technical issue.'

"But what happens only a couple weeks later? When we go back a couple of weeks later to talk with him, what does he say? 'Oh, there was a computer glitch, technical issues.' Why the sudden change? He said that he has signed a separation agreement with Mr. C's and that in that separation agreement, he agreed to delete the records from his computer, to destroy them. Why? Why did they have to be destroyed? Why are they

101

the only missing records the lost and found records from the time of [Weinstein] assaulting [JD1]?"

Later, the prosecutor referenced the jury instruction on consciousness of guilt and suppression of evidence (CALCRIM No. 371), arguing: "[Weinstein]'s effort to conceal evidence, whether it be by telling someone not to go forward to the police after he raped or assaulted them or by working with someone, whether it was Mr. Cipriani to try to make evidence disappear at Mr. C's Hotel, that concealing or telling people not to go to the police, that is evidence that he knew he was guilty of the crimes. And the judge gave you this instruction that says that." Defense counsel did not object to any part of the prosecutor's argument.

After the defense presented its argument, and just before the prosecution presented its rebuttal argument, defense counsel raised the following issue with the court:

"As the court recalls, the People requested [CALCRIM No.] 371, which relates to destroying or destruction of evidence, and we objected on the grounds that when that instruction was proffered, it was meant to apply to the allegation that somehow Mr. Weinstein made records from Mr. C's disappear. The court found there was not an appropriate grounds -- the court found there was not a proper legal basis for giving 371 based upon the Mr. C's issue.

"The People then requested the instruction with regard to alleged threats by Mr. Weinstein against Jane Does 1 and 3, and the court agreed to give that instruction on that basis. However, yesterday in closing argument Ms. Martinez [the prosecutor] referenced section [*sic*] 371 and discussed it in relation to an allegation that Mr. C's records somehow disappeared.

102

"Your Honor, we chose not to object at that time. We let her make her arguments. She has let us have our argument. But I would like to ask the court to admonish Mr. Thompson [the other prosecutor], should he intend to go there, that that would be an inappropriate invocation of 371 that the court has already ruled on."

The court responded: "I don't think I ruled that it wasn't. I just said -- when you asked me what the basis of it was, I said the statements made to the alleged victims. I didn't say it wasn't the Mr. C's issue, that I recall. I just said it was the statements to the alleged victims." The court asked the prosecutor, "But I don't know -- are you planning on going into that, Mr. Thompson?" The prosecutor replied: "I'm not, but I concur with the court, and we have made it clear that that was also the basis of why we were requesting 371. And the defense did not request limiting language within 371, which it could have done. The obvious plain language of 371 applies to both circumstances, and we have indicated our intent to argue it that way." The court stated, "Okay. Well -- okay. We'll leave it at that."

During rebuttal argument, the prosecutor discussed Weinstein's emails to Cipriani, the missing lost-and-found records, and Weinstein's former attorney's investigation regarding evidence from the Mr. C Hotel. As noted by Weinstein in his appellate briefing, the prosecutor argued, among other things: "So, as you know, the defense has subpoena power. If these records were truly destroyed -- there must be an I.T. company. They don't just vanish without somebody just looking into it. Where is the person that can describe that to us?" The prosecutor also argued: "Then we have the investigation started by his attorney . . . [.] [S]o this is after Mr. Weinstein has already

103

been involving himself with Giuseppe Cipriani for two months. Then his attorney gets involved in December -- end of December 2013. [¶] Now, here is where the magic comes in. These are all the records that you see in this trial that that computer glitch did not affect."

The prosecutor did not specifically reference CALCRIM No. 371 in the rebuttal argument, and defense counsel raised no objection to any part of the argument.

### 3. *Motion for new trial*

Weinstein argued in his motion for new trial that it was improper to instruct the jury with CALCRIM No. 371, and referenced the prosecutor's arguments to the jury in the motion. In denying the motion, the trial court stated, "I do think the jury in this case was properly instructed and I don't think there was misconduct on the part of the People with respect to that."

### b. *Applicable law and analysis*

" 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. [Citation.] Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference.' " (*People v. Hart* (1999) 20 Cal.4th 546, 620; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 ["to the extent Coffman contends that facts giving rise to an inference of

104

consciousness of guilt must be conclusively established before [the instruction] may be given, she is incorrect; there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference"].) "To support an inference that the defendant attempted to suppress evidence, the record need not establish that the evidence actually was destroyed." (*Hart*, at p. 620.) We independently review the trial court's decision to give the instruction. (*Cole*, *supra*, 33 Cal.4th at p. 1217.)

Sufficient evidence supports the trial court's decision to instruct the jury with CALCRIM No. 371. First, there was evidence supporting the inference that Weinstein discouraged JD1 from reporting the crimes and testifying against him. She testified at trial that immediately after Weinstein committed the sexual offenses, "He was acting like nothing happened. He was giving me compliments and then he say that better I'm not talking to no one about it. 'You do know me' he say. [*Sic*.]" When the prosecutor asked JD1, "What did you take that to mean," she responded, "My understanding he's somebody powerful that's better I'm not talk because it's dangerous for me. . . . [*Sic*.]" Because of these statements, she was too afraid to tell her children's nanny what happened when she called her the same night. Based on this evidence, the court did not err in giving CALCRIM No. 371, which allows the jury to infer consciousness of guilt from evidence that the defendant tried to discourage someone from testifying against him.

As to the second theory—the missing lost-and-found records—we reject Weinstein's assertion that the court's ruling precluded the prosecution from presenting this theory to the jury. Although the court stated that it overruled the defense's objection

105

to CALCRIM No. 371 based on evidence of Weinstein's "statements about not telling anybody about what happened," the court did *not* rule that the prosecution was precluded from referencing CALCRIM No. 371 to advance the theory about the missing lost-and-found records. And the defense did not ask for such a ruling. Later, during a break in argument, the court confirmed that it had not limited the prosecution's use of CALCRIM No. 371 to just the one theory about discouraging a witness from testifying.

The court did not err in allowing the prosecution to present the second theory to the jury because there was evidence supporting the inference that Weinstein attempted to suppress incriminating evidence from the Mr. C Hotel. After JD1 reported Weinstein's crimes to the police, Weinstein emailed Cipriani, the owner of the management company that ran the Mr. C Hotel, attaching a photo of JD1 and asking Cipriani whether he or his staff knew her, and admonishing Cipriani to be discreet. Weinstein sent follow-up emails, asking to speak with Cipriani, and telling him not to take calls from a certain woman (identified by her first name only) or her brother. A couple of months later, Weinstein attempted to arrange a dinner with Cipriani and Cipriani declined. Weinstein wrote back, "Already cancelled I won't ask again u guys have been amazing to me Wont forget. . . . [*Sic*.]" Weinstein also stated in this email that he could introduce Cipriani to a potential investor, acknowledging that he did not know if Cipriani needed such an investor. Subsequently, for purposes of this criminal litigation, the Mr. C Hotel produced certain records from the time of JD1's stay (e.g., her hotel folio, noise complaints about the fire alarm, etc.) but not others (lost-and-found records). At trial, former hotel employees

(who were employed at the hotel in February 2013) testified that lost-and-found records for a period of time before June 2013 were erased in 2013 due to an I.T. (information technology) issue. Two and a half years before trial, however, when prosecutors asked one of these same former employees about the reported "computer glitch" that deleted the records, he laughed and replied, " 'Well, that's what I would say, if I didn't want to turn over the records.' " This evidence supports an inference that Weinstein contacted Cipriani to ensure that the hotel would provide no incriminating evidence linking Weinstein to JD1 or, in the words of CALCRIM No. 371, that "the defendant tried to hide evidence." The trial court did not err in allowing the prosecution to argue this theory to the jury. Consequently, the prosecutors did not commit "prosecutorial misconduct" in doing so, notwithstanding Weinstein's claim to the contrary.

Weinstein contends the prosecution "interfered with [his] Fifth Amendment rights by telling the jury 'the defense has subpoena power. If these records were truly destroyed -- there must be an I.T. company. They don't just vanish without somebody just looking into it. Where is the person that can describe that to us?' " We agree with the Attorney General that Weinstein forfeited this contention. "When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal." (*People v. Morales* (2001) 25 Cal.4th 34, 43-44.) The defense did not object to this or any other part of the prosecution's argument. "The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm."

(*People v. Clark* (2011) 52 Cal.4th 856, 960.)  Weinstein suggests that any objection would have been futile, although he does not explain why with respect to this argument specifically.

Even if Weinstein had preserved this claim for review, or it would have been futile to object, the claim fails on the merits.  In *People v. Ratliff* (1986) 41 Cal.3d 675, 691, the case on which Weinstein relies in support of his claim of Fifth Amendment interference, our Supreme Court explained, "[T]he *Griffin* rule [*Griffin v. California* (1965) 380 U.S. 609] forbids any reference to a defendant's failure to take the stand in his defense, but 'that rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.' "  In questioning why the defense did not introduce evidence from the I.T. company that erased the lost-and-found records, the prosecutor did not comment on Weinstein's silence or "the absence of evidence that only the defendant's testimony could provide."  (*People v. Brady* (2010) 50 Cal.4th 547, 565-566.)  There was no *Griffin* error.

Weinstein has shown no error with respect to CALCRIM No. 371.

## I.    Weinstein's Claim of Juror Bias Is Forfeited and Without Merit

Weinstein contends, "Where [his] jury received inherently prejudicial extrinsic information of his prior rape conviction in New York, a conviction that was later vacated, a substantial likelihood of juror bias exists, entitling [him] to a new trial."

### 1.    *Relevant proceedings*

During voir dire of prospective jurors on Panel B, defense counsel asked, "Who in here immediately thought this is the Harvey Weinstein case.  I already know a little bit about it, I've

108

read about it, he must be guilty." Prospective Juror 101 indicated he was aware of Weinstein's conviction in New York, but stated he understood the court's instruction to only consider the evidence presented in this case and affirmed that he could be fair. No prospective jurors from Panel B were seated on Weinstein's jury.

The following day, during voir dire of prospective jurors on Panel A (from which Weinstein's jury was chosen), defense counsel asked the panel, "Do you think when you first heard the name Harvey Weinstein you immediately thought, 'Oh, oh, oh, hang on a second. Time out. I already know about this guy. I think he's done some stuff and I've started to make up my mind a little bit about whether or not he's probably guilty?'" Prospective Juror 52 responded, "It's hard to avoid the news and determine and have a fair mind with Mr. Weinstein being guilty or not and given that his convictions in New York is [*sic*] so public. It's hard to avoid that." Defense counsel followed up, "Do you think you might go into the deliberation room sort of with giving the prosecution a little bit of a head start because you already know about some other things that you've read about in the media?" Prospective Juror 52 replied, "Maybe not directly from the media but the court's ruling in New York."

In addition to Prospective Juror 52, prospective jurors 33, 32, 10, 4, 49, 43, 12, and 46 all expressed a concern about remaining unbiased in light of Weinstein's New York convictions. Some questioned, "[I]f he's guilty in New York how can he be not guilty here[?]" The court excused all but prospective jurors 32 and 43 for cause. The defense exercised peremptory challenges as to these jurors, and they were excused. At the time

Weinstein's jury was empaneled, the defense had not used all of its peremptory challenges.

### 2.    *Applicable law*

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors."  (*People v. Nesler* (1997) 16 Cal.4th 561, 578.)  " 'The Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence "based on the evidence presented in court." ' "  (*People v. Mataele* (2022) 13 Cal.5th 372, 402-403.)  Voir dire "enables the trial court and the parties to determine whether a prospective juror is unbiased and both can and will follow the law."  (*People v. Wilson* (2008) 44 Cal.4th 758, 822.)

### 3.    *Analysis*

As the Attorney General points out, challenges to the "manner of conducting voir dire" are forfeited "by failing to raise them with the trial court when the court could have addressed them."  (*People v. Oyler* (2025) 17 Cal.5th 756, 807.)  It is not clear, however, what defense counsel could have challenged because here, voir dire functioned as it should.  Prospective jurors indicated they were aware of Weinstein's New York convictions.  Defense counsel explored whether they could and would follow the law.  All jurors who expressed bias were excused, either for cause or by peremptory challenge.  On this record, Weinstein's claim of a "substantial likelihood of juror bias" is without merit.

He argues that his "entire trial process was infected" because his "New York conviction was never introduced into evidence and the jury was never told to disregard the information."  He did not ask the trial court to instruct the jury to

110

disregard the information, and it is too late to raise an objection now.  The jury *was* instructed, however, that it was only permitted to consider evidence presented in *this* case.  (See CALCRIM No. 222 [" 'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence"].)  "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."  (*Sanchez, supra*, 26 Cal.4th at p. 852.)

Weinstein further asserts that "the jury labored under the gross misapprehension that [he] was fairly and justly convicted of rape in New York."  The vacation of his New York convictions does not retroactively establish bias where none existed before.

Even if Weinstein preserved a claim for review, he has not demonstrated error.

## J.     Weinstein Is Entitled to Resentencing

Penal Code section 1170, subdivision (b) provides, in pertinent part: "(b)(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).  [¶]  (2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. . . .  [¶]  (3) Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based

111

on a certified record of conviction without submitting the prior convictions to a jury."

Here, the trial court imposed an upper term sentence based solely on an aggravating factor that no longer exists—Weinstein's New York convictions that have since been vacated.  As the parties agree, Weinstein is entitled to resentencing.  Accordingly, we vacate his sentence and remand the matter for that purpose.[11]

## DISPOSITION

The sentence is vacated and the matter is remanded for resentencing.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

---

[11] We reject Weinstein's contention that cumulative error requires reversal of his convictions.  As explained above, he has demonstrated no error, let alone multiple errors.